**LYNCOTT CORPORATION, et al.**

v.

**CHEMICAL WASTE
MANAGEMENT, INC., et al.**

Civ. A. No. 87–1794.

United States District Court,
E.D. Pennsylvania.

June 30, 1988.

Edward M. Dunham, Jr., Miller, Marvin, Dunham, Doering, Schreiber & Sloan, Philadelphia, Pa., for plaintiffs.

Barry M. Klayman, Bruce S. Katcher, Franklin Poul, Robert D. Fox, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for defendants.

## OPINION

CAHN, District Judge.

In 1985, Chemical Waste Management, Inc. commenced an action in this court seeking to recover under the liability provisions of the Comprehensive Environmental Response, Compensation, and Liability Act for response costs incurred or to be incurred by it for a clean-up of the Lyncott Landfill in New Milford, Pennsylvania. *Chemical Waste Management, Inc. v. Armstrong World Industries,* Civil Action No. 85–1703 (the "CERCLA litigation"). Several defendants in that action, generators of hazardous wastes that were deposited at the landfill, filed third-party complaints naming, among others, the three plaintiffs in the case at bar, Lyncott Corporation, Lyncott Holdings, Inc., and Richard Valiga, and Waste Management, Inc., a

defendant here, as third-party defendants in the CERCLA litigation. Thereafter, plaintiffs cross-claimed against defendant Waste Management in the CERCLA litigation and filed a separate complaint for declaratory judgment pursuant to 28 U.S.C. §§ 2201–02. That declaratory judgment action is now before me. Since it is essentially identical to the cross-claims, my opinion in the CERCLA litigation, reported at 669 F.Supp. 1285 (E.D.Pa.1987), is incorporated herein as background material.

Plaintiffs seek a determination of their rights under two agreements executed in settlement of certain related state and federal court litigation involving the Lyncott facility. The question plaintiffs present to the court is whether or not the agreements entitle the plaintiffs to indemnification against the claims of the third-party plaintiffs in the CERCLA litigation and attorney's fees and costs incurred in that litigation. The case was tried to the court on December 14, 1987, on which date I held defendants' motion for an involuntary dismissal under Federal Rule of Civil Procedure 41(b) in abeyance. Upon consideration of the evidence, briefs, and arguments of counsel, I now grant this motion on the ground that upon the facts and the law the plaintiffs have shown no right to indemnification. Nevertheless, as clarified in part D of this Opinion, I also hold that the agreements are not irrelevant to the allocation of response costs in the CERCLA litigation and should be given effect under a theory other than indemnification. I make the following findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 41(b) and 52(a).

## FINDINGS OF FACT

1. Plaintiff Lyncott Corporation ("Lyncott"), is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

2. Plaintiff Lyncott Holdings, Inc. ("Lyncott Holdings"), is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

3. Plaintiff Richard E. Valiga ("Valiga"), is an individual who resides at 19 Fort Royal Isle, Ft. Lauderdale, Florida and is the sole shareholder, officer and director of Lyncott Holdings. Lyncott is a wholly-owned subsidiary of Lyncott Holdings.

4. Defendant Chemical Waste Management, Inc. ("CWM"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Oak Brook, Illinois.

5. Defendant Waste Management, Inc. ("WM"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Oak Brook, Illinois.

6. On November 14, 1980, Waste Management of Pennsylvania ("WMPA"), a subsidiary of WM, entered into an asset purchase agreement (the "Purchase Agreement") with Old Stabatrol, the owner and operator of the Lyncott Landfill in Susquehanna County, Pennsylvania (the "Lyncott site"). Pursuant to the Purchase Agreement, WMPA acquired all the assets, rights, and properties of Old Stabatrol, including the right to operate the Lyncott site, all permits for the Lyncott site, and the stock of Lyncott. According to the Purchase Agreement, WMPA did not assume any of the liabilities or obligations of Old Stabatrol except those designated on Schedule H of the Purchase Agreement relating to certain tax liabilities, financial liabilities on Old Stabatrol's consolidated balance sheet as of August 31, 1980, and liabilities arising out of the ordinary course of Old Stabatrol's business from August 31, 1980 until the date of closing. Subsequent to the acquisition, Lyncott became a wholly owned subsidiary of WMPA, which in turn changed its name to Stabatrol Corporation ("Stabatrol") and became a wholly owned subsidiary of CWM. Old Stabatrol changed its name to the Metzval Corporation ("Metzval") and subsequently dissolved.

7. After the acquisition of the Lyncott site, the Pennsylvania Department of Environmental Resources ("DER") discovered

several violations of the DER permit and Pennsylvania environmental laws. The DER issued an order in 1981 halting all waste disposal activities and requiring certain remedial measures at the site. Over the next three years, CWM and Lyncott engaged in extensive negotiations with the DER to develop an appropriate remedial plan. Finally, in 1984 CWM, Lyncott and the DER settled their differences through a stipulation entered into in litigation captioned *Commonwealth of Pennsylvania, Department of Environmental Resources and Susquehanna County, George Campbell and The Concerned Citizens of New Milford v. Chemical Waste Management, Inc. and Lyncott Corporation*, Commonwealth Court of Pennsylvania, No. 2137CD 1982 ("the Stipulation"). Pursuant to the Stipulation, CWM and Lyncott agreed to be responsible for implementation of specified response actions at the Lyncott site.

8. On June 26, 1981, following the DER's initial order, Stabatrol filed suit against Old Stabatrol and its former owners in the United States District Court for the Middle District of Pennsylvania. The suit alleged that Old Stabatrol and its former owners had made fraudulent misrepresentations concerning the acquired assets and breached their warranties under the Purchase Agreement. The suit sought rescission or reformation of the Purchase Agreement, restitution of monies and compensatory damages. A second action in equity was commenced on February 12, 1982 in the Court of Common Pleas of Montgomery County, Pennsylvania. It also alleged fraud and misrepresentation and sought rescission of the Purchase Agreement and restitution.

9. Plaintiffs and defendants were among the parties who began negotiations to settle these two lawsuits in late December 1984 and early January 1985. Valiga acted as plaintiffs' principal in the negotiations.

10. Valiga testified that during the settlement negotiations, plaintiffs initially sought to have a general indemnity for claims made by third parties relating to the site included in the settlement agreement. This request was denied by the defendants in early March 1985.

11. Valiga further testified that on March 27, 1985, an oral settlement agreement was reached among the parties. Two days later, on March 29, 1985, he was informed that CWM had commenced the CERCLA litigation.

12. Upon learning of the CERCLA litigation, Valiga and his negotiating team reviewed the draft language of the settlement papers that were being finalized for execution. Based on that review, they decided that it was not necessary to press for a revision of the draft language, even in light of the threat of third-party claims by the generators in the CERCLA litigation.

13. A rider to the draft agreement addressing plaintiffs' potential role in the CERCLA litigation may have been prepared by plaintiffs' lawyers. However, no further request for an indemnification clause or a general release was ever in fact made to the defendants. The issue was not brought up again, and plaintiffs made no effort to confirm with defendants their understanding of the agreement on the issue of indemnity for suits by third parties.

14. On April 1, 1985, plaintiffs and defendants were among the parties who entered into a written settlement agreement (the "Settlement Agreement"). The Settlement Agreement parties were: Stabatrol, WM, CWM (Stabatrol, WM and CWM being collectively referred to herein as the "Waste Management Group"), Metzval, Darbron Corporation ("Darbron"), 1533 North Fletcher Corporation ("1533"), Park L. Metzger ("P. Metzger"), Valiga, and Lee L. Metzger ("L. Metzger") (P. Metzger, Valiga and L. Metzger being referred to collectively herein as "Shareholders"; Metzval, Darbron, 1533 and the Shareholders being referred to as the "Metzval Group"; and the Metzval Group, Lyncott and Lyncott Holdings being referred to as the "Lyncott Parties").

15. The Settlement Agreement provided for the rescission of the Purchase Agreement and the reassignment of the assets, rights, properties and business originally acquired from Old Stabatrol to Lyncott on

an "as is" basis. Pursuant to paragraph 3 of the Settlement Agreement, Metzval retained $1.377 million of the original purchase price; $2.623 million held in escrow as a portion of the purchase price was returned to WM with interest; and an installment advance of $1.75 million set aside as a contingent prepayment to Metzval of certain quarterly installment payments as part of the purchase price was repaid to WM without interest. Pursuant to paragraph 7, WM paid the Shareholders $2.55 million on account of litigation costs and in settlement of their disputed claims.

16. Furthermore, section 4.3 of the Settlement Agreement provides:

Section 1.4 of the Purchase Agreement provided that Stabatrol did not assume and was not responsible for the liabilities of Metzval or the Subsidiaries except as provided on Schedule H to the Purchase Agreement.... To the extent that Stabatrol may be deemed to have assumed any other liabilities of Metzval or the Subsidiaries beyond the scope of the liabilities set forth on Schedule H of the Purchase Agreement, Metzval agrees that it will cause Lyncott to be responsible for such liabilities, if any. Metzval will continue to be responsible for liabilities not assumed by Stabatrol under the Purchase Agreement.

17. The Settlement Agreement required Metzval to deliver to WM affidavits setting forth the approximate present net worth of each Shareholder. Similarly, Metzval, 1533 and Darbron agreed to deliver to WM affidavits setting forth the approximate present net worth of each corporation. These affidavits became part of the Settlement Agreement on the closing date. The delivered affidavits reflected that the Shareholders' net worths were $70,500, $51,700 and $88,000 for Valiga, P. Metzger and L. Metzger respectively, with a large portion of each Shareholder's assets held jointly with his spouse. The corporations had no net worths. Valiga testified that these affidavits were incorporated into the Settlement Agreement to show that the plaintiffs did not have the funds to undertake the clean-up at the Lyncott site required by the Stipulation. Plaintiffs' ability to pay for the obligations in the Stipulation was important because the Settlement Agreement transferred control of Lyncott from the Waste Management Group to the Metzval Group.

18. On April 1, 1985, Lyncott, Lyncott Holdings, and WM also executed a Maintenance Agreement, which the parties incorporated into the Settlement Agreement through section 6 thereof. In the Maintenance Agreement WM agreed to maintain the site in compliance with the Stipulation. CWM and Lyncott originally were jointly responsible for the Stipulation's obligations. By virtue of the Maintenance Agreement, however, WM became solely responsible for implementation of the clean-up at the landfill, including off-site removal of the waste in the vaults, and preparation of a remedial, closure, and post-closure plan for the site. WM alternatively agreed to comply with any final court or administrative orders regarding the Lyncott site clean-up.

19. Section 10 of the Settlement Agreement contains mutual covenants not to sue between the Lyncott Parties and the Waste Management Group. The covenants not to sue cover

any claim, demand, action, cause of action or liability (whether or not now known, suspected or claimed), including any claim for contribution or indemnity, which any of the [parties] ever had, now has or hereafter may have against any of the [other parties] from the beginning of the world to the date of these presents and especially, but without limitation, any claim(s) relating to or arising out of or in connection with the negotiation, execution, delivery and performance of the Agreement for the Purchase and Sale of Assets; *provided,* that [the parties] may be sued solely with respect to the transactions contemplated by the Settlement Agreement.

20. The covenants expressly reserve the right of the parties to the Settlement Agreement to sue non-parties.

21. In this vein, section 6 of the Maintenance Agreement provides that it confers

benefits and imposes duties only on the parties to that Agreement and not on third parties.

22. The Settlement and Maintenance Agreements are to be governed by and construed in accordance with Pennsylvania law.

23. The Settlement and Maintenance Agreements contain no other provisions which are pertinent to this lawsuit.

## DISCUSSION

### A. *Declaratory Judgment Prerequisites*

It is well-established that granting or denying relief in declaratory judgment actions is within the sound discretion of the court. *See Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942). Before granting or denying such relief, however, a court must determine whether an "actual controversy" exists within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201. Although there is no precise definition as to what is or is not an "actual controversy," at the very least the facts averred must present a substantial controversy between adverse parties of sufficient immediacy and reality as to warrant a declaratory judgment. *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Plaintiffs argued in their motion for summary judgment and at trial that all the prerequisites for a declaratory judgment have been fulfilled in this case. Defendants have not challenged this assertion; in fact, by requesting summary judgment in their favor on the merits, defendants presume that jurisdiction exists over a ripe dispute. This presumption is well-grounded. There does exist a ripe controversy here because, by reason of the third-party complaints in the CERCLA litigation, plaintiffs are exposed to the ongoing obligation of defending themselves against the claims of the generators, as well as the potential for liability on the merits. What plaintiffs

seek here is, in essence, a determination of whether they must put on a defense in the CERCLA litigation. A judgment in plaintiffs' favor here will obviate the accrual of further defense costs and provide insurance against any damages assessed at trial. A loss here, on the other hand, will presumably spark a vigorous contestation of liability against the generators.

Based on the foregoing, and taking into account the convenience to the parties of the declaratory judgment mechanism, and the fact that the factors which will determine the relative rights and obligations between the parties in the CERCLA litigation are distinct from the obligations of the parties to the Settlement and Maintenance Agreements, I find that jurisdiction is proper under the Declaratory Judgment Act. *See ACandS, Inc. v. Aetna Casualty & Surety Co.,* 666 F.2d 819, 822–23 (3d Cir.1981); *Bitiminous Coal Operators' Ass'n, Inc. v. International Union, United Mineworkers of America,* 585 F.2d 586, 596–97 (3d Cir.1978).[1]

### B. *Rule 41(b) Standard*

Rule 41(b) of the Federal Rules of Civil Procedure provides:

After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

A dismissal under Rule 41(b) differs from a directed verdict in a jury trial in that the court need not determine that the defendant is entitled to judgment as a matter of law. *See Martin v. E.I. duPont de Nem-*

---

1. I also find that this case is not barred by section 10 of the Settlement Agreement. A suit seeking a declaration as to the meaning of the agreements and a clarification of the rights and

obligations of the signatories falls within the proviso language of the covenants not to sue. *See infra* note 2.

ours & Co., Inc., 281 F.2d 801, 802 (3d Cir.1960); 5 J. Moore, J. Lucas & J. Wicker, *Moore's Federal Practice* ¶ 41.13(4) at 41–177 to 41–179 (2d ed. 1985). Instead, as the finder of fact, the court must weigh the evidence and resolve disputed issues of fact and credibility. *DuPont v. Southern Nat'l Bank,* 771 F.2d 874, 879 (5th Cir.1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1467, 89 L.Ed.2d 723 (1986). Therefore, in deciding this motion, I have considered the evidence brought out by cross-examination as well as by direct. *Dickerson v. United States Steel Corp.,* 439 F.Supp. 55, 64 (E.D. Pa.1977).

### C. *Express or Implied Contractual Duty to Indemnify*

Although not explicitly stated in any of their pre-trial submissions or at the trial itself, plaintiffs' claim seems to be based primarily on an express contractual duty to indemnify. There is no specific provision in either the Settlement or the Maintenance Agreement labeled "indemnification." Nonetheless, plaintiffs are correct in supposing that I will construe contractual provisions as treating indemnification when the requisite intention appears, although the parties refer to it by some other name. 41 Am.Jur.2d *Indemnity* § 6 (1968). Of course, in such a case the burden of proof falls on the party seeking indemnification. *Beloit Power Systems, Inc. v. Hess Oil Virgin Islands Corp.,* 757 F.2d 1427, 1429 (3d Cir.1985).

■ Indemnity contracts are to be interpreted in accordance with the rules governing the construction of contracts generally. *Babcock & Wilcox Co. v. Fischbach and Moore, Inc.,* 218 Pa.Super. 324, 280 A.2d 582 (1971); 41 Am.Jur.2d, *supra,* at 691. The cardinal rule is, of course, to discern the parties' mutual intent as reflected in the contract language. *Bainville v. Hess Oil V.I. Corp.,* 837 F.2d 128 (3d Cir.1988); *Z & L Lumber Co. v. Nordquist,* 348 Pa.Super. 580, 502 A.2d 697, 700 (1985). Where two agreements are executed at the same time and are intertwined by the same subject matter, they are to be interpreted together, each one contributing to the ascertainment of the parties' intent.

*Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 107 (3d Cir.1986).

■ "When the terms of a contract are clearly expressed, the intention of the parties must be determined from the language used.... However, '[w]here the language of the written contract is ambiguous, extrinsic or parol evidence may be considered to determine the intent of the parties.'" *Z & L Lumber,* 502 A.2d at 700 (quoting *Metzger v. Clifford Realty Corp.,* 327 Pa. Super. 377, 385, 476 A.2d 1, 5 (1984)). Determining whether contract terms are clear or ambiguous is a question of law. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980). In making the ambiguity determination, a court must consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of that meaning. *Id.* After hearing the evidence presented by both parties, the court must decide whether "there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differing meanings." *Id.*

■ Consistent with these principles, I held a hearing in this case and now conclude as a matter of law that the agreements at issue here are not ambiguous. The following is clear from the face of the contracts. There is no provision in either the Settlement or the Maintenance Agreement specifically requiring defendants to indemnify plaintiffs for any liability or for any defense costs incurred in connection with the CERCLA litigation. The Maintenance Agreement, as integrated into the Settlement Agreement, does require the defendants to implement the remedial actions required by the Stipulation. That duty cannot, however, be equated with a duty to indemnify the plaintiffs against independent claims made by the generators in the CERCLA litigation. Moreover, under section 4.3 of the Settlement Agreement, liability arising from the contractual undertakings between Old Stabatrol or Lyncott and the generators was assumed or reassumed by Metzval or Lyncott on or before

the settlement date, thus negating any inference that indemnity is owed by virtue of such contracts.

Furthermore, the testimony of the plaintiffs' own witness about the negotiation process bears out rather than contradicts the conclusion that the omission of an indemnity provision was intentional and should be viewed as controlling. Both the Settlement and the Maintenance Agreements expressly permit the Waste Management Group to assert claims against third parties, including claims arising out of environmental conditions at the Lyncott site. Prior to entering into the Settlement Agreement and the Maintenance Agreement, the plaintiffs were aware that CWM had initiated the CERCLA action against the generators, and that the generators potentially might seek to join them as third-party defendants. Nonetheless, the plaintiffs did not renew their previously rejected demand for indemnification, and the agreements executed by the parties do not contain an indemnity provision. In light of the foregoing, I hold that the agreements are unambiguous and their express language provides no support for the indemnification plaintiffs request.

■ Despite this analysis, plaintiffs' contention that, at least as between them and the defendants, it was agreed that WM would shoulder the burden of the clean-up, has considerable force. Defendants argue that this is in essence no more than an argument for the implication of an indemnity term and that no term should be implied that was expressly refused during the settlement negotiations and purposefully omitted from the final agreements. Accepting defendants' construction of plaintiffs' argument, I find this legal analysis persuasive.

"A contract of indemnity need not be express; indemnity may be recovered if the evidence establishes an implied contract." 41 Am.Jur.2d, *supra,* at 705; *accord Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 363 (3d Cir.1987) ("The contract of the parties is not to be found in its express terms alone but includes their bargain in fact as found in their language or by implication from other circumstances."); *Gallagher v.*

*Upper Darby Township,* —— Pa.Commw. ——, 539 A.2d 463, 467 (1988). However, "[t]he law will not imply a different contract than that which the parties have expressly adopted. To imply covenants on matters specifically addressed in the contract itself would violate this doctrine." *Hutchinson v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 388 (1986); *see also* 11 *Williston on Contracts* § 1295 (3d ed. 1968) (implied term justifiable only when not inconsistent with express terms of contract and absolutely necessary to effectuate intent of parties). In the instant case, plaintiffs assert that under the Settlement Agreement and the Maintenance Agreement, defendants impliedly agreed to indemnify them against third-party claims brought by the generators arising out of environmental conditions at the Lyncott site. The evidence is to the contrary, however, since it demonstrates that defendants expressly rejected any indemnity in favor of the Metzval Group. Under these circumstances, an implied indemnity would defeat the intent of the parties to the agreements. Moreover, such a holding would be inconsistent with the law of this case on implied indemnity. *See Chemical Waste Management, Inc. v. Armstrong World Industries, Inc.,* 669 F.Supp. 1285, 1294–95 (E.D.Pa.1987) (promise to indemnify under CERCLA must be express). For these reasons, I decline to declare an implied indemnification provision. This does mean that the agreements have no effect in the context of the CERCLA litigation; on the contrary, in the next portion of the Opinion I shall discuss what I believe to be the correct method of fitting these agreements into CERCLA's scheme, a theory ignored by both groups of parties to this action.

### D. *Contribution Protection Under CERCLA*

■ Although I reject plaintiffs' indemnification argument, as noted above, I nevertheless find persuasive their underlying conclusion that the Settlement and Maintenance Agreements codified an understanding that as between the Waste Management Group and the Lyncott Par-

ties, it was the former who would perform and fund the site clean-up rather than the latter. The evidence shows that all parties to the agreements were aware that the Metzval Group did not have the funds to undertake the remedial work at the Lyncott site. In fact, it was defendants who sought to have the affidavits of net worth showing the Metzval Groups' impecunity incorporated into the agreements. Construing section 7.3 of the Settlement Agreement (incorporating the affidavits into the Settlement Agreements) and section 1 of the Maintenance Agreement (requiring WM to perform the remedial work) together, I conclude that the bargain of the parties was that since the Metzval Group did not have the funds to perform the clean-up, it was agreed that, as between the two groups, the Waste Management Group would be responsible for implementing and paying for the remedial work. Furthermore, in section 10 of the Settlement Agreement defendants relinquished their right to sue the Lyncott Parties to recover these clean-up costs, including their right to proceed against the Lyncott Parties under CERCLA.[2] This covenant not to sue, given in exchange for valuable consideration, is equivalent to a release of CERCLA claims. *Caplan v. City of Pittsburgh,* 375 Pa. 268, 100 A.2d 380 (1953).

In reaching this conclusion, I have relied on Pennsylvania law relating to the construction of releases. *See Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1457–60 (9th Cir.1986) (state law should provide the general content of federal law on the scope and validity of releases of claims for cost-recovery under CERCLA); *Three Rivers Motor Co. v. Ford Motor Co.,* 522 F.2d 885, 888–893 (3d Cir.1975) (Pennsylvania state law adopted as rule of decision in construction of antitrust release). *See generally Id.* at 892–96 (setting out Pennsylvania law on releases). The next question to be addressed is what effect this release

should have in the context of the CERCLA litigation. In other words, I must determine the effect of a release or covenant not to sue one joint tortfeasor upon the right of other tortfeasors to contribution under CERCLA. This is an issue on which a uniform federal rule should be adopted so that consistent principles of contribution and allocation of damages develop in actions under CERCLA. *See Poleto v. Consolidated Rail Corp.,* 826 F.2d 1270, 1282 (3d Cir.1987); *Three River Motors,* 522 F.2d at 890–91 (discussing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)); *Colorado v. Asarco, Inc.,* 608 F.Supp. 1484, 1489 (D.Colo.1985); *Developments in the Law–Toxic Waste Litigation,* 99 Harv.L. Rev. 1458, 1538 n. 118 (1986).

As has been discussed in the Comment to the Caveat to Section 886A of the Restatement of Torts (2d), there are three possible solutions for the situation in which one tortfeasor enters into a settlement agreement that does not purport to be a full satisfaction of the injured party's claim. First, the non-settling tortfeasors are still able to obtain contribution against the settling tortfeasor, despite the release. Second, the non-settling tortfeasors are not entitled to contribution unless the release was given not in good faith. Third, the injury party's claim is reduced by the proportionate share of the settling tortfeasor. The first solution was adopted by the 1939 Uniform Contribution Act. The second solution was adopted by the 1955 Uniform Contribution Among Joint Tortfeasors Act. The third solution was adopted by the 1977 Uniform Comparative Fault Act. As stated in the Restatement, each solution has its drawbacks and "no one is satisfactory."

*United States v. Conservation Chemical Co.,* 628 F.Supp. 391, 401 (W.D.Mo.1985). I

---

**2.** I interpret the proviso to the covenants not to sue in section 10 to exempt two kinds of suits from the general prohibition against future lawsuits: (1) suits seeking a judicial interpretation of the meaning of the agreements; and (2) suits seeking to enforce specific obligations undertaken in the agreements. However, I reject any

interpretation of the proviso that would allow the fact that the clean-up of the site is a "transaction contemplated by the Settlement Agreement" to be used as an excuse to reopen the issues of who cleans or who pays for the clean-up.

conclude, as did Chief Judge Wright in *Conservation Chemical,* that the principles of the Uniform Comparative Fault Act are the most consistent with CERCLA.[3] *See also Edward Hines Lumber Co. v. Vulcan Materials Co.,* No. 85 C 1142 (N.D. Ill. December 2, 1987) [available on WEST-LAW, 1987 WL 27368]. *But see United States v. Pepper's Steel and Alloy's, Inc.,* 658 F.Supp. 1160, 1167–68 (S.D.Fla.1987) (approving application of Uniform Contribution among Tortfeasors Act); Note, *A Right of Contribution under CERCLA: The Case for Federal Common Law,* 71 Cornell L.Rev. 668, 682–83 (1986); Note, *The Right to Contribution for Response Costs Under CERCLA,* 60 Notre Dame L.Rev. 345, 361–63 (1985). Specifically, I reject the solution adopted by the Uniform Contribution Act because its lack of finality discourages settlement of both private party and government CERCLA suits, a linchpin of the Superfund program. *See* Note, *Superfund Settlements: The Failed Promise of the 1986 Amendments,* 74 Va. L.Rev. 123, 132 (1988). I also reject the second solution because the Uniform Contribution Among Tortfeasors Act rejects comparative fault in favor of pro rata apportionment, an approach inconsistent with the law previously established in this case, and because it would require a fairness hearing in every case to decide if a settlement is in good faith. *See Hines Lumber, supra; Chemical Waste,* 669 F.Supp. at 1292 n. 10. In contrast, the U.C.F.A. ex-

pressly provides for the application of comparative fault in actions based upon strict liability. *Cf. Murray v. Fairbanks Morse,* 610 F.2d 149, 160 n. 13 (3d Cir.1979) (endorsing this approach in a products liability context). In addition, the U.C.F.A. avoids the inequity that might develop were nonsettlers forced to absorb the total cost of shares of responsibility that are not allocable to solvent responsible parties, *see* Note, *supra,* 74 Va.L.Rev. at 141–42; it also solves the problem of settlements involving nonmonetary consideration. *Cf.* Unif. Contrib. Among Tortfeasors Act § 4, 12 U.L.A. 63 (1975) (reducing claim against nonsettling defendants to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater).

In sum, I hold that the combined effect of the Settlement Agreement and the Maintenance Agreement is to relieve the Lyncott Parties from the burden of paying for the clean-up of the Lyncott site and to release them from CERCLA liability in the CERCLA litigation. In order to give effect to these agreements and to grant plaintiffs the contribution protection[4] to which they are entitled, the Lyncott Parties' equitable shares of the response costs, if any, must be attributed to plaintiff in the CERCLA litigation. This allocation is to be accomplished in accordance with the U.C.F.A.

---

**3.** Section 6 of the Uniform Comparative Fault Act, 12 U.L.A. 37, 50 (Supp.1988) (hereinafter "U.C.F.A.") provides as follows:

A release, covenant not to sue, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, *the claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation,* determined in accordance with the provisions of Section 2.

Section 2 provides in part:

(a) In all actions involving fault of more than one party to the action, including third-party defendants and persons who have been released under Section 6, the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories or, if

there is no jury, shall make findings, indicating:

(1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and

(2) the percentage of the total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under Section 6. For this purpose the court may determine that two or more persons are to be treated as a single party.

(b) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.

**4.** By "contribution protection" I mean a guaranty to settling parties that they will not later be found liable for contribution to nonsettlers.

These concepts are in accord with the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1615. *See* 42 U.S.C.A. §§ 9613(f)(2), 9622(h)(4) (West Supp.1987) (authorizing contribution protection in cases of settlement with the government). This result is also consistent with the stipulation between CWM and the generators in the CERCLA litigation as to the effect to be given to settlements between CWM and settling generator defendants. *See* Stipulation and Order at 4, *Chemical Waste Management, Inc. v. Armstrong World Industries, Inc.,* No. 85–1703 (E.D.Pa.Feb. 17, 1987).[5]

■ Unfortunately, contribution protection against CERCLA claims does not allow plaintiffs to be dismissed from the CERCLA litigation. Since the Settlement Agreement does not concede that the Lyncott Parties are liable as joint tortfeasors, defendants have the right to require the Lyncott Parties to remain in the case through trial and verdict in order to establish their joint tortfeasor status. *See Rocco v. Johns–Manville Corp.,* 754 F.2d 110, 114 (3d Cir.1985). More importantly, the third-party plaintiffs have also asserted causes of action based on breach of contract, breach of warranty, fraud, misrepresentation, negligence, contractual and common law indemnity. As was explained in part C, *supra,* the Waste Management Group did not grant the Metzval Group a general indemnity against third-party claims such as these. Furthermore, CERCLA does not preempt state law remedies against parties who are not liable under CERCLA but are potentially liable under state law. *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 685 F.Supp. 651 (N.D.Ill.1988). This analysis leads to the conclusion that the state law causes of action in the third-party complaints must be allowed to proceed.[6] If the third-party plaintiffs prevail on these counts, they may use the proceeds of that victory to pay any judgment rendered against them by virtue of CWM's complaint in the CERCLA litigation.[7]

Accordingly, I arrive at the following:

## CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction to adjudicate plaintiffs' claim for

---

5. One might conceivably argue that the Settlement and Maintenance Agreements stand on a different footing than the settlements with the generators because at the time the agreements were signed, the Lyncott Parties were not parties to the CERCLA litigation and the causes of action brought in the two lawsuits these agreements settled were not based on CERCLA. *Cf. Cingoranelli v. St. Paul Fire and Marine Ins. Co.,* 658 P.2d 863 (Colo.1983); *In re Jones & Laughlin Steel Corp.,* 328 Pa.Super. 442, 477 A.2d 527 (1984). These agreements, however, clearly manifest "an intent to settle all accounts." *Three River Motors,* 522 F.2d at 896. In other words, the covenants not to sue, and the claims they released, are broader than the actual causes of action contained in the settled complaints. CERCLA liability was a matter that "can fairly be said to have been within the contemplation of the parties when the release was given." *Estate of Bodnar,* 472 Pa. 383, 372 A.2d 746, 748 (1977). Thus, I see no reason for distinguishing the Settlement Agreement from the stipulations settling the claims against the generators.

Of course, CWM's settlement of a CERCLA claim or a potential CERCLA claim with one joint tortfeasor does not release the others unless CWM received full satisfaction of its CERCLA claim, a question which must be resolved at trial. *See Chemical Waste,* 669 F.Supp. at 1297 n. 16; Restatement (Second) of Torts § 885 (1977); U.C.F.A. § 6, 12 U.L.A. 37, 50 (Supp. 1988).

6. Consistent with this ruling, my holding here should not be read to suggest that the Waste Management Group assumed or succeeded to any state law obligation of the Metzval Group to indemnify the generators. I previously ruled that the trier of fact must determine whether CW is a "successor" to or a "continuation" of Old Stabatrol. *Chemical Waste,* 669 F.Supp. at 1292 n. 11. Thus, CW remains free to rebut this contention at trial.

7. An alternative, and perhaps simpler, analysis of this case yields the same result. In order to establish a right to contribution, joint and several liability for the underlying injury must first be established. Once proved, however, no defendant in a suit for contribution may be forced to pay more than his own equitable share of the liability. *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 229 (W.D.Mo.1985); *Developments in the Law, supra,* 99 Harv.L.Rev. at 1532. Since liability for contribution under CERCLA is not joint, at the equitable apportionment stage of the CERCLA proceedings the third-party plaintiffs' need for contribution under § 107 of CERCLA from the third-party defendants will evaporate, just as it does when the Lyncott Parties' equitable shares of response costs are attributed to CWM through the U.C.F. A.

declaratory relief pursuant to 28 U.S.C. § 1332 (1982) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 (1982).

2. The Settlement and Maintenance Agreements are valid contracts enforceable under both Pennsylvania and federal law.

3. Plaintiffs bear the burden of proving an express or implied agreement to indemnify. Plaintiffs have not sustained their burden.

4. Plaintiffs are nonetheless entitled to contribution protection against claims based on the Comprehensive Environmental Response, Compensation, and Liability Act under the provisions of the Uniform Comparative Fault Act.