**JOSLYN MANUFACTURING COMPANY, Plaintiff–Appellant,**

v.

**T.L. JAMES & CO., INC., Defendant–Appellee,**

v.

**POWERLINE SUPPLY CO., INC., Defendant Third Party Plaintiff–Appellant.**

**and**

**Nelda S. ELLIOT, Bill Elliot, and Lance D. Alworth, Louisiana and Arkansas Railroad Co., Defendants–Appellants,**

v.

**Floyd Benjamin JAMES and George William James, Sr., Third Party Defendants–Appellees.**

**No. 88–4901.**

United States Court of Appeals, Fifth Circuit.

Jan. 29, 1990.

Robert E. Holden, Mary S. Johnson, Liskow & Lewis, New Orleans, La., for plaintiff-appellant.

David F. Butterfield, Mayer, Smith & Roberts, Shreveport, La., for Elliot & Powerline Supply.

Kevin M. Ward, Cogswell & Wehrle, Denver, Colo., James L. Adams, Brook, Morial, Cassibry, Fraiche & Pizza, Shreveport, La., for Lance D. Alworth.

Bobby S. Gilliam, Jerald N. Jones, Wilkinson, Carmody & Gilliam, Shreveport, La., for Louisiana and Arkansas Railroad Co.

William F. Ridlon, II, Asst. Atty. Gen., Baton Rouge, La., for amicus curiae, State of La.

Donald A. Carr, U.S. Dept. of Justice, Michael P. Healy, Anne S. Almy, Appellate Section, Land & Natural Resources Div., Washington, D.C., for amicus curiae U.S.

Donald B. Mitchell, Jr., Stephen J. Weiss, James P. Mercurio, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., and Robert G. Dawkins, Dawkins, Coyle & Carter, Ruston, La., for defendant-appellee, T.L. James & Co., Inc.

Before GEE and JONES, Circuit Judges, and HUNTER, District Judge: *

GEE, Circuit Judge:

Appellant contends that the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Louisiana Environmental Quality Act ("LEQA") impose direct liability on parent corporations for violations of their wholly-owned subsidiaries. Appellant further contends that, absent such liability, the corporate veil should be pierced to impose liability in the instant case. We disagree with both contentions.

### Facts

This case arises from the environmental cleanup of a former creosoting plant constructed by the Lincoln Creosoting Company, Inc. ("Lincoln") in Bossier City, Louisiana. Under Lincoln's creosoting recovery system, raw creosoting chemicals dripped from the treating cylinders to a sump pit located underneath the system. Lincoln recovered some creosoting chemicals from the sump. The remaining chemicals were discharged into an open ditch and flowed to the eastern portion of the site, where the chemicals collected in a slough. From the slough, the creosoting chemicals were washed away by rain to the surrounding land areas and waterways.

Lincoln was incorporated in 1935 when C.A. Tooke and J.R. Hayes proposed a business arrangement with T.L. James whereby T.L. James Co., ("James Co.") would put up the initial capital in return for stock in the company. Under the arrangement, Tooke and Hayes would purchase 40% of the 200 shares of common voting stock and James Co. would own 60% of the common stock and all 200 shares of the non-voting preferred stock of Lincoln. Tooke and Hayes endorsed their shares over as security for their unpaid capital subscription.

At the initial Board of Directors meeting, Tooke was elected Vice President and designated "General Manager with full power and discretion to conduct the affairs" of Lincoln. T.L. James was elected President; his son G.W. James later succeeded him. Lincoln originally established a seven member Board of Directors. Five of these directors were associated with James Co., Tooke and Hayes held the other two seats. Lincoln maintained separate financial books and a separate corporate banking account. Only Hayes and Tooke had check-signing authority. Lincoln regularly held shareholders and directors meetings.

Dissatisfied with Lincoln's performance in the mid-1940's, G.W. James bought out Hayes. G.W. James, then president of Lincoln, hired Lacy, a former James Co. employee, to replace Hayes. In 1945 Lincoln reduced its Board of Directors to five. The new Board consisted of three Lincoln employees who had no ties to James Co. and two persons associated with James Co. In 1947, the Board was expanded to eight members and consisted of four Lincoln employees and four persons associated with James Co.

---

* District Judge of the Western District of Louisiana, sitting by designation.

Lincoln owned its own property and equipment, and maintained its own employees, payrolls, insurance, pension system, and workman's compensation program. Lincoln filed its own tax returns.

In 1950 Tooke died and Lincoln was sold to Joslyn Manufacturing Co. ("Joslyn"). Joslyn owned and operated the plant until Koppers Company, Inc. ("Koppers") purchased it in 1969. Koppers owned the plant until 1971. The property then passed through five separate owners, the last of which subdivided the property. Appellant Powerline Supply Company ("Powerline") purchased one of the subdivided lots in 1982. Appellant Alworth purchased one such lot in 1983. Appellant Louisiana and Arkansas Railway Company ("Railway") owned property adjoining the plant site from 1923 through 1972.

Joslyn filed this action in the district court invoking that court's exclusive jurisdiction under Section 113(b) of the CERCLA. 42 U.S.C. Section 9613(b). Joslyn brought this action claiming that James Co. was liable under 42 U.S.C. Section 9607(a)(2) as an "owner or operator." Joslyn also advanced claims under the Louisiana Environmental Quality Act ("LEQA"). La.Rev.Stat.Ann. Section 30:2001 (West Supp.1989). The defendants included James Co., Railway, and Powerline. Powerline filed third-party complaints against, *inter alia*, Lance Alworth; Alworth then filed a cross-claim against James Co.

The district court granted James Co.'s motion for summary judgment, concluding that Congress, in enacting CERCLA, did not intend an exception to the general rule in corporation law of limited liability. 696 F.Supp. 222.

## Discussion

■ CERCLA provides in relevant part: Section 107(a)(2), 42 U.S.C. Section 9607(a)(2), makes liable:

(2) any person who at the time of disposal of any hazardous substance owned or opperated any facility at which such hazardous substances were disposed of. . . .

"Owner or operator" is defined in the statute as:

(20)(A)(ii) in the case of an onshore facility . . . any person owning or operating such facility, and (iii) in the case of any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency, abandonment, or similar means to a unit of State or local government, any person who owned, operated or otherwise controlled activities at such facility immediately beforehand. Such term does not include a person, who, without participating in the management of a . . . facility, holds indicia of ownership primarily to protect his security interest in the . . . facility.

42 U.S.C. § 9601(20).

Joslyn urges this court to read CERCLA's definition of "owner or operator" liberally and broadly to reach parent corporations whose subsidiaries are found liable under the statute. In doing so, Joslyn urges us to follow the several courts, including the Second Circuit, which have extended CERCLA liability to parents. *See New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir.1985); *United States v. Mottolo*, 695 F.Supp. 615 (D.N.H.1988); *Colorado v. Idarado Mining Co.*, 18 Envtl.L.Rep. (Envtl.L.Inst.) 20578 (D.Col.1987); *Vermont v. Staco, Inc.*, 684 F.Supp. 822 (D.Vt.1988); *Idaho v. Bunker Hill Co.*, 635 F.Supp. 665 (D.Idaho 1986). We decline to do so.

Significantly, CERCLA does not define "owners" or "operators" as including the parent company of offending wholly-owned subsidiaries. Nor does the legislative history indicate that Congress intended to alter so substantially a basic tenet of corporation law. "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if it is plain . . . the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). Joslyn asks this court to rewrite the language of the Act significantly and hold parents directly liable for their subsidiaries' activities. To do so would dramatically alter traditional concepts of corporation law. The "normal rule of statutory construction

is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midlantic Nat'l Bank v. New Jersey*, 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986). Any bold rewriting of corporation law in this area is best left to Congress.

Appellants have pointed this court to little in the legislative history of CERCLA to indicate that Congress intended to make such a significant change in corporation law principles. Powerline points to an "inherent" underlying intent of Congress to hold those who profited from hazardous waste sites responsible for the cost of cleanup and a desire to effectuate a timely cleanup of these sites. As the Court noted in *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 267, 99 S.Ct. 2753, 2759, 61 L.Ed.2d 521 (1979), *reh. denied*, 444 U.S. 889, 100 S.Ct. 194, 62 L.Ed.2d 126 (reviewing Court of Appeals' decision modifying longshoreman's preexisting rights), "[S]ilence is most eloquent, for such reticence while contemplating an important and controversial change in existing law is unlikely." Without an express Congressional directive to the contrary, common-law principles of corporation law, such as limited liability, govern our court's analysis. *See Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1427–1430 (D.C.Cir.1988).

If Congress wanted to extend liability to parent corporations it could have done so, and it remains free to do so. The Seventh Circuit recently declined to expand the "owner or operator" definition, although it recognized the policy benefits inherent in a broad reading of the Act's scope. *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155 (7th Cir.1988) ("To the point that courts could achieve 'more' of the legislative objectives by adding to the lists of those responsible, it is enough to respond that statutes have not only ends but also limits.").

As the district court observed, Congress is quite capable of creating statutes that hold shareholders or controlling entities liable for the acts of valid corporations. In fact, Congress adopted a "control" test in the next subsection of the statute. Under CERCLA, the term "owner or operator" is defined for facilities conveyed to state or local governments by bankruptcy, tax delinquency or abandonment, as "any person who owned, operated *or otherwise controlled* activities at such facility immediately" before conveyance. 42 U.S.C. Section 9601(20)(A)(iii) (emphasis added). No such "control" test appears in subsection (ii), the subsection at issue in this case, and we will imply none. Similarly, La.Rev.Stat.Ann. Section 30:2276 (West 1989 Supp.) does not impose direct liability on parent corporations for the acts of their subsidiaries.

■ Further, the facts here militate against piercing the corporate veil. Lincoln faithfully adhered to basic corporate formalities by keeping its own books and records and holding frequent shareholder and directors meetings. The daily operations of Lincoln and James Co. were separate. Hayes and Tooke were the most involved in the operations of Lincoln; neither was employed by James Co. Lincoln owned its own property, and the property was not used by James Co. Lincoln filed separate tax returns. Lincoln paid its own bills and made its own arrangement for employee benefits. The notes from the 1950 special shareholders meeting indicate that Lincoln operated quite independently from James Co.

■ The district court was correctly guided by our court's prior decision in *United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686 (5th Cir.1985), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986). There, our Circuit set out criteria for analyzing the issue of "control" in the parent/subsidiary context. In this case, the district court ran through the "laundry list" and properly found that the facts did not justify piercing the corporate veil. Veil piercing should be limited to situations in which the corporate entity is used as a *sham* to perpetrate a fraud or avoid personal liability. *See Jon–T, supra* at 691 (quoting *Krivo v. Industrial Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098, 1106 (5th Cir.1973)) ("control required for liability under the 'instrumen-

tality' rule amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation"). The facts in this case do not support a finding that Lincoln was designed as a bogus shell for James Co. to hide behind.

The district court allowed extensive discovery in this case. Appellants have pointed to those matters that they believe constitute a material issue of fact for determining whether James Co. can be held indirectly liable for Lincoln's activities. Those facts, if true, do not justify piercing the corporate veil. Therefore, the district court's grant of James Co.'s summary judgment motion was proper. We AFFIRM.[1]

---

**1.** Because it was not ruled on below we do not here pass on Powerline's "corporate distributee theory of liability—Powerline asserts that James Co. was Lincoln's corporate distributee and that, as such, James Co. may be responsible.