**MOBAY CORPORATION, Plaintiff,**

v.

**ALLIED–SIGNAL, INC., et al., Defendant.**

Civ. A. No. 89–4268.

United States District Court, D. New Jersey.

April 2, 1991.

Albert Besser, A. Patrick Nucciarone, Jeffrey Cohen, Hannoch Weisman, Roseland, N.J., for plaintiff Mobay Corp.

Matthew Boylan, Lee Hilles Wertheim, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for defendant-cross-claimant Allied Signal, Inc.

Bruce I. Goldstein, Saiber, Schlesinger, Satz & Goldstein, Newark, N.J., John S. Hahn, Kirk R. Ruthenberg, Sonnenschein, Nath & Rosenthal, Washington, D.C., and Geraldine Moss, American Home Products Corp., New York City, for defendant American Home Products Corp.

## CORRECTED SUPERCEDING OPINION

WOLIN, District Judge.

This case requires resolution of complex issues regarding the scope of liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* (CERCLA). "The meager legislative history available [for CERCLA] indicates that Congress expected the courts to develop a federal common law to supplement the statute." *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 89 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). The issues presented in this case require this Court to develop federal common law to settle some open questions in the statutory scheme.

Before the Court are two summary judgment motions. In the first motion, defendant American Home Products Corporation ("AHP") has moved for summary judgment on both CERCLA and state law issues raised in plaintiff Mobay Corporation's ("Mobay") complaint and co-defendant Allied–Signal, Inc. ("Allied") cross-claims against AHP. AHP urges the Court to accept its interpretation of CERCLA and rule that AHP cannot be held liable under CERCLA as a matter of law. This Court finds that such a narrow interpretation of CERCLA contradicts the aims of the statute and it will deny summary judgment to AHP on the CERCLA claims. However, with regard to the pendent state law claims, the Court will grant Mobay leave to amend its complaint and Allied leave to amend its cross-claim to state a cause of action based on piercing the corporate veil.

The second motion before the Court is plaintiff Mobay's motion for partial summary judgment striking defendant Allied's fifth affirmative defense. In this defense, Allied claims that the Assumption Agreement between Allied and Mobay's corporate predecessor[1] relieved Allied of all liability under CERCLA. Allied opposes this motion and has filed a cross-motion to compel discovery regarding the Assumption Agreement. The Court finds that, because the Assumption Agreement failed to include a clear release of Allied's CERCLA or environmental liability, Allied may not rely on the Assumption Agreement as a defense. The Court will therefore dismiss Allied's fifth affirmative defense as to Mobay's CERCLA claims and deny Allied's motion to compel discovery.

---

1. Harmon Colors Corporation ("Harmon Colors"), which was merged into Mobay in 1981, purchased the Haledon site involved in this litigation in 1976. Subsequent to the purchase, Harmon Colors executed an Assumption Agreement with Allied in 1977. The parties do not dispute that Mobay, as the corporate successor to Harmon Colors, is responsible for Harmon Colors' obligations under the Assumption Agreement.

## I. BACKGROUND

### A. *The Haledon Site*

From 1936 to 1942, Harmon Color Works ("Harmon") owned a 48 acre parcel of land located in Haledon Borough, New Jersey ("the site") on which it manufactured organic pigments utilized by the paint industry. In 1942, Harmon sold all of its stock to AHP. During the time that AHP owned Harmon, Harmon continued the manufacture of organic pigments. Also during AHP's ownership, Harmon was merged for approximately a year with the Marietta Dyestuffs Corporation, which was sold by AHP as a separate division in 1946.

In 1950, AHP sold the stock of Harmon to B.F. Goodrich ("Goodrich"). From 1950 until 1959, Goodrich continued Harmon's business at the site. In 1959, Goodrich sold Harmon, including the site, to Allied Chemical Corporation, a predecessor of Allied. Allied Chemical conducted the same business at the site until 1977. On January 17, 1977 Harmon Colors Corporation ("Harmon Colors"), a wholly owned subsidiary of Rhinechem Corporation, purchased all the assets of the Harmon business and the site from Allied Chemical pursuant to a Purchase Agreement dated September 17, 1976. In 1977, Harmon Colors and Allied Chemical signed an Assumption Agreement in which Harmon Colors assumed certain liabilities related to the site. In 1981, Harmon Colors was merged into Mobay, another subsidiary of Rhinechem. As a result of the merger, Mobay emerged as the surviving corporate entity and owner of the Harmon chemical business and the site.

### B. *Environmental Cleanup Required*

On March 27, 1984, the New Jersey Department of Environmental Protection ("NJDEP") notified Mobay that it suspected the existence of areas of environmental concern at the site. NJDEP directed Mobay, as the site's present owner, to submit a proposal to investigate conditions at the site. After a series of letters and meetings, NJDEP conditionally approved Mobay's proposal on September 9, 1985. In 1986, analytical results of certain groundwater samples taken at the site indicated the presence of volatile organic compounds and heavy metals, including cadmium, chlorobenzene, hexavalent chromium, lead, tetrachloroethylene, vinyl chloride and zinc, which are considered hazardous substances under CERCLA.

NJDEP advised Mobay in December, 1986 that a remedial investigation and feasibility study ("RI/FS") was necessary to define the nature and extent of contamination and to analyze remedial alternatives. Mobay and NJDEP subsequently executed an administrative consent order ("ACO") which became effective on July 8, 1988. The ACO requires Mobay to implement an RI/FS and remedial measures at the site. By October, 1989 Mobay had implemented interim remedial measures, expending $759,000. Mobay estimates that the RI/FS will cost approximately $1,750,000 but is unable to calculate the ultimate cost of cleaning up the site after the RI/FS is completed.

### C. *Claims in This Suit*

On October 17, 1989 Mobay brought this suit against Allied, Goodrich and AHP alleging both federal and state claims for recovery of the investigation and cleanup costs at the site. Counts One and Two of Mobay's complaint allege that defendants are liable for their share of environmental response costs, under CERCLA § 107 and § 113, respectively. 42 U.S.C. § 9607 (direct liability of owners and operators of a facility) and § 9613 (liability for contribution). Counts Three through Eight of Mobay's complaint allege various state law claims against the defendants.[2]

On February 28, 1990 defendant Allied filed an answer and counterclaim against Mobay alleging that Mobay is responsible for environmental response costs under the Assumption Agreement. Allied also

---

**2.** The specific claims alleged in these counts are the following: Count Three (strict liability in tort), Count Four (negligence), Count Five (restitution), Count Six (contribution), Count Seven (indemnification), and Count Eight (only against Allied, contractual breach of warranties and representations).

claimed that Mobay breached the Agreement by seeking recovery from Allied and for failing to include Allied in the release that it obtained from NJDEP. Allied filed cross-claims against defendants AHP and Goodrich alleging claims for contribution under CERCLA § 113 and common law contribution and indemnity.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact, and once the moving party has sustained this burden, the opposing party must introduce specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Williams v. Borough of West Chester,* 891 F.2d 458, 464 (3d Cir.1989).

A genuine issue is not established unless the evidence, viewed in a light most favorable to the nonmoving party, would allow a reasonable jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Radich v. Goode,* 886 F.2d 1391, 1395 (3d Cir.1989). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Radich,* 886 F.2d at 1395. Whether a fact is material is determined by substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *United States v. 225 Cartons,* 871 F.2d 409, 419 (3d Cir.1989).

Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Appelmans v. City of Philadelphia,* 826 F.2d 214, 216 (3d Cir. 1987). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, depositions, interrogatory answers, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553; *Cooley v. Pennsylvania Housing Finance Agency,* 830 F.2d 469, 474 (3d Cir.1987).

### B. Development of Federal Common Law Under CERCLA

CERCLA's principal goal is decisive action to begin remediation of the nation's major hazardous waste sites.[3] A fundamental policy underlying CERCLA is to accomplish this objective at the primary expense of private responsible parties rather than taxpayers. The House Report explained that the purpose of § 107 of CERCLA is "to provide a mechanism for prompt recovery of monies expended for the costs of [remedial actions] ... from persons responsible therefor and to induce such potentially liable persons to pursue appropriate environmental response actions voluntarily." H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 33 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6136.

The motions before the Court require the Court to resolve two central issues: (1) what test should determine a parent corporation's CERCLA liability for acts of its subsidiaries, and (2) what standard should be employed to interpret a contract purporting to release CERCLA liability. As a preliminary matter, the Court must decide

---

**3.** The House Report on H.R. 7020, which became the CERCLA statute, described the goals of the bill as:

> an inventory of inactive hazardous waste sites in a systematic manner, establishment of priorities among the sites based on a relative danger, a response program to contain dangerous releases from inactive hazardous waste sites, acceleration of the elimination of unsafe

hazardous waste sites, and a systematic program of funding to identify, evaluate and take responsive actions at inactive hazardous waste sites to assure protection of public health and the environment in a cost-effective manner.

H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 25 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6128.

whether these questions should be answered by state or federal common law.

### 1. Parent Corporation Liability

■ With regard to the first question, whether a parent corporation should be held liable as an "owner" or "operator" for the activities of a subsidiary, it is clear that federal common law should be employed to interpret CERCLA. *United States v. Nicolet, Inc.,* 712 F.Supp. 1193, 1201–02 (E.D. Pa.1989); *In re Acushnet River & New Bedford Harbor Proceedings,* 675 F.Supp. 22, 31 (D.Mass.1987).[4] To achieve CERCLA's remedial goals of protecting public health and the environment, courts are "obligated to construe its provisions liberally." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir. 1986). *See also New York v. Shore Realty Corp.,* 759 F.2d 1032, 1045 (2d Cir.1985).

■ CERCLA's legislative history reveals that Congress intended that the courts should develop federal common law to fill in the gaps in the statute. For example, Representative Florio, CERCLA's House sponsor, stated: "To insure the development of a uniform rule of law, and to discourage business[es] dealing in hazardous substances from locating primarily in states with more lenient laws, the bill will encourage the further development of a Federal common law in [the CERCLA liability] area of law." 126 Cong.Rec. H11787 (daily ed. Dec. 3, 1980).

■ In addition, other courts have recognized that state common law rules should not be applied to override federal legislative policies and have been willing "to disregard it if the interests of public convenience, fairness, and equity so demand."

*United States v. Mottolo,* 695 F.Supp. 615, 624 (D.N.H.1988). The *Mottolo* court found that the lack of a federal common law rule of veil-piercing could frustrate CERCLA's goal of imposing liability on responsible parties. *Id.* The court also found CERCLA's broad imposition of liability and its silence on the subject of corporate veil-piercing to be persuasive evidence that "CERCLA places no importance on the corporate form." *Id.* In *Nicolet,* the court concluded that

> the strong federal interest in uniform enforcement of environmental legislation set forth by Congress, the very real risk that the application of state laws would frustrate the objectives of the federal program; and the fact that a federal law would not disrupt commercial relations predicated on state law, warrants the development of a uniform federal rule applicable to alter ego claims under CERCLA.

712 F.Supp. at 1202. Similarly, another district court has commented:

> One can hardly imagine a federal program more demanding of national uniformity than environmental protection. Congress did not intend that the ability of the executive to fund the cleanup of hazardous waste sites should depend on the attitudes of the several states toward parent-subsidiary liability in general or CERCLA in particular. The need for a uniform federal rule is especially great for questions of piercing the corporate veil, since liability under the statute must not depend on the particular state in which a defendant happens to reside.

*In re Acushnet River & New Bedford Harbor Proceedings,* 675 F.Supp. at 31.[5]

---

**4.** AHP argues that state common law standards for piercing the corporate veil have been applied to determine parent liability in the context of other federal statutes. *See, e.g., American Bell, Inc. v. Federation of Tel. Workers,* 736 F.2d 879, 886–67 (3d Cir.1984) (Labor–Management Relations Act); *Environmental Tectonics v. W.S. Kirkpatrick & Co.,* 659 F.Supp. 1381, 1388 (D.N. J.1987), *aff'd in relevant part and rev'd in part,* 847 F.2d 1052 (3d Cir.1988), *aff'd,* 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (Racketeer Influenced and Corrupt Organizations Act). However, unlike these statutes, CERCLA is a

strict liability statute. Plaintiffs do not need to establish intent on the part of any involved owner or operator in order to establish liability.

**5.** In addition, in *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802 (S.D.Ohio 1983), the court determined that issues relating to the scope of CERCLA liability should be decided by uniform federal rules. The court explained:

> The improper disposal or release of hazardous substances is an enormous and complex problem of national magnitude involving uniquely federal interests.... A driving force

This Court agrees that state law should not be employed to frustrate the compelling national policies underlying CERCLA. Rather than incorporate state veil-piercing standards, this Court will join other federal courts in developing a federal common law to determine a parent corporation's CERCLA liability for the actions of its subsidiary.

### 2. Release of CERCLA Liability

■ With regard to the second question of CERCLA interpretation, whether a contract releasing CERCLA liability should be interpreted by state or federal common law, it is clear that federal law governs the issue. Federal law always governs the validity of releases of federal causes of action. *Dice v. Akron, C. & Y. R. Co.*, 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952). However, the next step involves determining the content of that federal law. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979). The fact that federal law governs does not mean that federal courts should always fashion a uniform federal rule. *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1457 (9th Cir.1986).

In a case involving a federal statute, Congressional intent is the key question. If Congress had explicitly directed judges to develop uniform federal standards or to adopt state law then the issue is settled. *Kimbell Foods*, 440 U.S. at 740, 99 S.Ct. at 1464. While CERCLA's legislative history strongly suggests a Congressional directive to federal courts to develop uniform federal rules, CERCLA does not contain a specific assertion of Congressional intent. "Although some difference exists between the establishment of CERCLA liability and the release of a CERCLA right of action, a uniform federal rule regarding releases from CERCLA liability serves Congress' goals in the same manner that a uniform

rule regarding liability does." *Mardan*, 804 F.2d at 1464 (Reinhardt, J., dissenting).

■ In the absence of some clear Congressional directive, the Court must also decide whether formulating a federal rule would be appropriate as a matter of judicial policy under the three-part test established by *Kimbell Foods*. Under that test, the Court must determine the following: (1) whether the issue requires "a nationally uniform body of law"; (2) "whether application of state law would frustrate specific objectives of the federal programs"; and (3) whether "application of a federal rule would disrupt commercial relationships predicated on state law." *Id.* at 728–29, 99 S.Ct. at 1458–59.

■ Under the first factor, uniformity with respect to releases from CERCLA liability is necessary to prevent the vagaries of differing state laws from affecting the incentive for voluntary cleanup. *Mardan*, 804 F.2d at 1464 (Reinhardt, J., dissenting). That incentive may be eliminated if an operator has inadvertently waived its right of cost recovery. *Id.* Furthermore, CERCLA, along with the Resource Conservation & Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6921–6931, represent a substantial federal interest in the abatement of hazardous waste. *United States v. A & F Materials Co.*, 578 F.Supp. 1249, 1255 (S.D.Ill.1984).

Under the second factor, the application of state law to interpret releases could frustrate CERCLA's specific objective of guaranteeing a rapid response when hazardous waste cleanup becomes necessary. *Mardan*, 804 F.2d at 1465 (Reinhardt, J., dissenting). *See also Wiegmann & Rose Int'l Corp. v. NL Industries,* 735 F.Supp. 957, 962 (N.D.Cal.1990) (Court stated that it could not apply state rules of interpretation that "would frustrate specific objectives" of CERCLA). "Without the ability to require contribution from other parties, the current operator may prefer to wait [to begin cleanup] and let the government per-

toward the development of CERCLA was the recognition that a response to this condition at the state level was generally inadequate. *Chem–Dyne*, 572 F.Supp. at 808. The court concluded that the delineation of a federal rule was

consistent with the legislative policies and history of CERCLA and that no compelling local interests mandated the incorporation of state law. *Id.* at 809.

form the work." *Mardan*, 804 F.2d at 1465 (Reinhardt, J., dissenting). Relying on government-initiated cleanups has two ·major disadvantages. First, the government's ability to monitor numerous sites and initiate cleanups on a nationwide basis is constrained by limited resources. *Id.* Second, government action is supposed to be a last resort, only after the failure of voluntary efforts. *Id.*

. Finally, considering the third factor, application of a uniform federal rule would not disrupt existing relationships predicated on state law. Parties could expect federal law to govern their rights, in light of the well-established rule that federal law governs federal releases. In addition, documents governing CERCLA transactions must be prepared in light of applicable federal law regarding other CERCLA provisions. *Id.*

Thus, under *Kimbell Foods*, it is appropriate for the Court, in light of the strong policy favoring uniformity on this issue, to apply a federal common law rule to interpret the Assumption Agreement between Allied and Mobay's corporate predecessor.[6]

### C. *Liability of Parent Corporation Under CERCLA*

Counts One and Two of Mobay's complaint allege that AHP is liable for response costs at the Haledon site as an "owner or operator" of a facility at which hazardous substances were disposed. Section 107(a)(2) of CERCLA provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" is liable for the costs of removal or remedial action. 42 U.S.C. § 9607(a)(2). Count Two of Mobay's complaint and Count One of Allied's cross-claim allege a claim for contribution pursuant to Section 113(f)(1) of CERCLA.[7]

"Owner or operator" is defined in CERCLA as "any person owning or operating [a]

facility." 42 U.S.C. § 9601(20)(A)(ii). AHP asserts that it, as a parent corporation, cannot be liable as an "owner or operator" for the activities of its wholly-owned subsidiary under § 107 or § 113 because Mobay and Allied have not alleged any facts which would justify piercing the corporate veil.

Two circuits recently considered this issue and reached divergent conclusions. In *Joslyn Manufacturing Co. v. T.L. James & Co.*, 893 F.2d 80 (5th Cir.1990), the first federal appellate court to address this issue determined that a parent corporation could not be liable under CERCLA for the acts of its subsidiary. *Id.* at 82. The court relied primarily on the fact that the parent corporation could not automatically be deemed an "owner" of an offending facility of its subsidiary. *Id.* at 82–83. The court found nothing in the language of CERCLA nor the legislative history revealing a Congressional intent to alter common law principles of corporate liability. *Id.* at 82. Thus, the *Joslyn* court held that a parent corporation is subject to liability as an "owner" only if the facts justify piercing the corporate veil, such that the subsidiary is the mere alter ego of the parent corporation. *Id.* at 82–83.

However, the First Circuit asserted that a parent corporation could be liable under CERCLA for the acts of its subsidiary as an "operator" of an offending facility. In *United States v. Kayser–Roth Corp.*, 910 F.2d 24 (1st Cir.1990), the court explained that Congress, by including a category in addition to owners, implied that a person who is an operator of a facility is not protected from liability by the legal structure of ownership. *Id.* at 26. Thus, it found that "a fair reading of CERCLA allows a parent corporation to be held liable as an operator of a subsidiary." *Id.* at 27.

In examining the district court's determination in *Kayser–Roth* that the company

---

6. At least one other federal court has suggested that a uniform federal rule should be adopted to interpret releases of CERCLA liability between joint tortfeasors. *Lyncott Corp. v. Chemical Waste Management, Inc.*, 690 F.Supp. 1409, 1417 (E.D.Pa.1988).

7. "Any person may seek contribution from any other person who is liable or potentially liable under Section 9607(a) of this Title...." 42 U.S.C. § 9613(f)(1).

was an "operator" within the statutory meaning, the court noted that to be an operator a parent must have "active involvement in the activities of the subsidiary." *Id.* It observed that in the usual case, a parent would not be liable because operator status "requires more than complete ownership and the concomitant general authority to control that comes with ownership." *Id.* The district court relied on several factors in determining that the parent exercised pervasive control over the subsidiary: (1) monetary control over accounts; (2) restriction of subsidiary's financial budget; (3) mandate that it conduct governmental contact for the subsidiary; (4) approval of the subsidiary's lease arrangements; (5) approval of capital transfers; and (6) placement of parent personnel in many subsidiary director and officer positions. *United States v. Kayser-Roth Corp.,* 724 F.Supp. 15, 18 (D.R.I.1989), *aff'd,* 910 F.2d 24 (1st Cir.1990). The First Circuit found that this level of control was "more than sufficient" to create operator liability under CERCLA. *Kayser-Roth,* 910 F.2d at 28.

All of the other district courts who have considered this issue have also found parent corporations to be liable under CERCLA if the parent controlled or participated in the subsidiary's activities. *See United States v. Allied Chemical Corp.,* Nos. 83-5896 and 83-5898, 1990 WL 263611 (N.D. Cal. June 27, 1990) (denying summary judgment because factual issues existed with respect to parent's liability either under traditional alter ego or significant control theories); *City of New York v. Exxon Corp.,* 31 Envtl.Rep.Cas. 1412, 112 B.R. 540 (S.D.N.Y.1990) ("actual participation in and authority or control over the affairs of a subsidiary or corporation are key factors in determining whether to hold a parent corporation or individual shareholder liable as an owner or operator"); *United States v. McGraw-Edison Co.,* 718 F.Supp. 154 (W.D.N.Y.1989) (summary judgment denied because factual issues existed with regard to direct liability); *United States v. Nicolet, Inc.,* 712 F.Supp. 1193, 1202-03 (E.D. Pa.1989) (denying parent's motion to dismiss because as a stockholder and direct participant in management, it could be liable for subsidiary's cleanup costs); *Rockwell Int'l Corp. v. IU Int'l Corp.,* 702 F.Supp. 1384 (N.D.Ill.1988) (summary judgment denied because parent corporation may be liable under CERCLA if it actively participated in the management and control of the subsidiary's facility); *Colorado v. Idarado Mining Co.,* 18 Envtl.L.Rep. 20578, No. 83-C-2385, slip op. at 3 (D.Colo. April 29, 1987) (parent corporation extensively involved in affairs of subsidiary could be characterized as "owner" or "operator"); *Idaho v. Bunker Hill Co.,* 635 F.Supp. 665, 671-72 (D.Idaho 1986) (evidence of control over subsidiary sufficient to impose liability on parent as "owner" or "operator"). One district court even found a parent corporation liable for subsidiary responsibilities as a matter of law, without any demonstration of control. *Vermont v. Staco, Inc.,* 684 F.Supp. 822, 831-32 (D.Vt. 1988).

Other cases, dealing with the liability of individual shareholders with a controlling interest in a corporation, held that shareholders who actively participate in the management of a facility can be liable under CERCLA. *See, e.g., New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985); *United States v. Conservation Chemical Co.,* 628 F.Supp. 391 (W.D. Mo.1985); *United States v. Northeastern Pharmaceutical & Chemical Co.* ("NEPACCO"), 579 F.Supp. 823, 848-49 (W.D.Mo. 1984), *rev'd in relevant part on other grounds and aff'd in part,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).

As the court in *Idarado Mining Co.* stated:

> the term "operator" must be interpreted with [CERCLA's] purpose in mind. As a practical matter, if mere interposition of a separate corporate entity could insulate against CERCLA liability, it would be far too easy to evade the statute.

18 Envtl.L.Rep. at 20578.

Most courts, then, have determined that individuals and corporations may be liable under CERCLA if they participated in the management of or exercised control over a

corporate entity. The management-control test has been most clearly described in *Kayser–Roth:*

> To be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum, it requires active involvement in the activities of the subsidiary.

910 F.2d at 27.

This test serves the broad remedial purpose underlying CERCLA to facilitate the fast, efficient cleanup of hazardous waste sites. *See generally* Aronovsky & Fuller, *Liability of Parent Corporations for Hazardous Substance Releases Under CERCLA,* 24 U.S.F.L.Rev. 421 (1990); Note, *Refining The Scope of CERCLA's Corporate Veil–Piercing Remedy,* 6 Stan.Envtl.L.J. 43 (1986–87). It properly places the risk of hazardous waste practices on those who elect to invest in a corporation, share in its profits and control its activities. In addition, it allows recovery from a parent corporation when a subsidiary has become insolvent.

■ In light of the persuasive authority for holding a parent corporation liable when it exercises significant management and control of its subsidiary, this Court finds that AHP may be liable as an "operator" under CERCLA. Rather than requiring a strict veil-piercing test to impose this liability, the Court will hold AHP liable for the activities of Harmon Color Works if it exercised control over or actively participated in the subsidiary's activities.

■ Because material issues of fact remain regarding the extent of AHP's active participation in the management and control of Harmon Color Works, summary judgment will be denied.

### D. *Liability of Parent Corporation Under New Jersey Law*

■ Counts Three through Seven of the Mobay complaint and Counts Two and

Three of the Allied crossclaim allege various causes of action arising under New Jersey statutory and common law. Mobay and Allied have not alleged these claims on a theory of piercing the corporate veil. Under New Jersey law, a corporate veil is not lightly pierced but may only be pierced in cases of "fraud, injustice or the like." *Allied Corp. v. Frola,* 701 F.Supp. 1084, 1088 (D.N.J.1988); *State of New Jersey, Department of Environmental Protection v. Ventron Corp.,* 94 N.J. 473, 500–01, 468 A.2d 150, 164–65 (1983). Neither the complaint nor the crossclaim plead any facts to support piercing the corporate veil against AHP. The pleadings assert only AHP's direct liability as an "owner" or "operator." Neither pleading even acknowledges that AHP was the parent corporation of Harmon Color Works, who was the actual owner of the Haledon site during the relevant time period. However, rather than dismiss these claims at this time, the Court will grant Mobay and Allied a period of 45 days [8] to amend their pleadings to properly allege a veil-piercing claim against AHP.

### E. *Assumption of CERCLA Liability*

Mobay argues that it is entitled to partial summary judgment striking Allied's fifth affirmative defense. This defense asserts that Mobay, as Harmon Colors' corporate successor, is liable for the CERCLA and common law claims relating to the Haledon site in the Assumption Agreement. Mobay claims that it is not solely responsible for CERCLA or other environmental claims under the agreement because the contract did not include a clear, express and unequivocal waiver of its right to recover from Allied with regard to CERCLA claims.

The Purchase Agreement by which Mobay's predecessor, Harmon Colors, purchased Harmon and the Haledon site, from Allied was executed in 1976, four years prior to the enactment of CERCLA.[9] Harmon Colors and Allied executed an Assumption Agreement in 1977 to determine

---

**8.** The Court believes that a 45–day period will give the parties sufficient time to investigate the matter to determine if a veil-piercing claim is warranted.

**9.** The Purchase Agreement between Mobay's predecessor and Allied does not discuss assumption of liabilities other than those related to breach of warranty. Purchase Agreement, ¶ 17.

the obligations transferred with the purchase of the property. Since CERCLA did not exist at the time the agreements were executed, the parties could not have expressly transferred their CERCLA obligations. Thus, the Court must decide whether Mobay's liabilities under the Assumption Agreement include CERCLA liabilities.

Allied asserts that Mobay, as Harmon Colors' successor, assumed liabilities for environmental claims in the Assumption Agreement. Section 2 of the Assumption Agreement states that Harmon Colors will indemnify Allied from:

> (2)(b) all obligations and liabilities relating to the Haledon Plant or Haledon Products arising out of claims made, or suits brought, on or after the Closing Date for (i) injury, sickness, disease or death of any person, or (ii) any damages to any property, in either case which is ultimately determined by the finder of fact to have resulted from any condition existing, substance consumed or discharged, product manufactured or action taken or omitted (such conditions, substances, products and action being hereinafter in this Section 3 called 'Causes') on or after the Closing Date, whether or not such cause existed prior to the Closing Date....

Assumption Agreement, ¶ 2. Allied maintains that Section 2(b)(ii), which concerns property damage claims, transfers CERCLA liability to Mobay, because the clause mentions damages from "any condition existing, substance consumed or discharged." Allied argues that since environmental conditions existed at the site at the closing date, Mobay is responsible for the response costs associated with these conditions. However, Mobay contends that this clause merely covers traditional property damage claims by third parties, such as tort, nuisance, or trespass, and does not extend to then unenacted statutory environmental claims.

Allied also asserts that a proviso in the Assumption Agreement, establishing a procedure for apportioning liability between

Allied and Mobay, supports its contention that Mobay's predecessor assumed environmental liability. The proviso, which is directed largely to worker's compensation claims by Haledon employees, applies only if:

> (D) such claim or suit is based upon a Cause other than a Cause relating solely to defects in, or use, operation or condition of Assets listed in clauses (1) and (2) of paragraph (b) of Section 2 hereof.... [10]

Assumption Agreement, ¶ 4. The proviso, therefore, would not apply to environmental claims. Allied argues that this demonstrates that Mobay is fully liable for environmental problems at the site, with no apportionment of liabilities between the parties.

■ As a preliminary matter, the Court notes that as between private parties, CERCLA liability can be transferred by contract. Section 107(e)(1) provides:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1). Under this provision, parties remain liable for response costs in a government-initiated cleanup. However, private parties may contractually transfer to or release another from CERCLA financial responsibilities. *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994 (D.N.J.1988); *Mardan,* 804 F.2d at 1459.

Several courts have considered contracts purporting to release a party from its CERCLA liability. Although no case presents a clause identical to the clause in the Assumption Agreement, these cases are instructive on the issue of interpreting contracts concerning CERCLA liability.

■ Courts have agreed that purchases of a business "as is" do not absolve a seller

10. The "Assets" refers to the Harmon Colors business and the site.

from CERCLA liability. *See Wiegmann & Rose Int'l Corp.*, 735 F.Supp. at 957; *Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784 (D.N.J.1989). *See also Allied Corp. v. Frola*, 730 F.Supp. 626 (D.N.J.1990). As the *Amland* court stated, "strict liability may be avoided only by a knowing agreement to accept the risk of an abnormally hazardous activity, and an 'as is' contract, under the circumstances here, does not amount to a knowing agreement." 711 F.Supp. at 803, n. 20.

On the other hand, other courts have found that very broad contractual provisions releasing a seller from a wide variety of claims have included waivers of CERCLA liability. For instance, in *FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285 (D.Minn.1987), *appeal dismissed*, 871 F.2d 1091 (8th Cir.1988), the court found that a 1967 release arising from a 1963 purchase and sale agreement released a seller from all future claims, including those under CERCLA.[11] The court viewed the release as including CERCLA response costs. The court reasoned that by entering into the separate 1967 release and incorporating the "may have" language, the parties demonstrated their intent to finally settle all liability issues arising from the sale. *Id.* at 1292.

In *Mardan*, the court found that a settlement agreement and release, executed one year after the closing of the a sale, included a release of CERCLA liabilities. The settlement agreement provided that:

**11.** The 1967 release provided:
In accordance with ... the Agreement dated December 31, 1963, ... FMC Corporation hereby releases and discharges Northern Pump Company from all claims, demands and causes of action which FMC had, has or may have arising under Article Eleven of said Agreement....
*FMC Corp.*, 668 F.Supp. at 1291.

**12.** The sale agreement provided:
Buyers agree that on the Closing Date [the Buyer] will assume and agree to perform and pay all the debts, liabilities, obligations, and contracts relating to the business of [the Seller] of whatever kind, character or description, whether or otherwise, existing or arising on or after April 30, 1977, which Buyers nonetheless reserve the right to contest, settle, or

[C]ertain other claims have been asserted by Mardan and Macmillan, each against the other, based upon or arising out of the Purchase Agreement, and the transactions contemplated therein; and the parties are desirous of settling all the aforesaid claims *and any other issues between them.*

*Mardan*, 804 F.2d at 1462 (emphasis by court). The court concluded that, as interpreted under New York law, the broad, unambiguous language of the general release meant that the buyer intended to give up all claims which it had or might someday have against the seller. *Id.*

Finally, in *United States v. South Carolina Recycling and Disposal, Inc.*, 653 F.Supp. 984 (D.S.C.1984), *aff'd in part and vacated in part sub nom. United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), the court found that a 1977 contract of sale waived the seller's CERCLA liability.[12] The court determined that the Buyer had assumed CERCLA liability because the contract clearly provided that the Buyers assumed all liabilities of any kind, existing or not at the time or sale. *Id.* In addition, the sales agreement specifically mentioned environmental laws by including a provision that to its best knowledge, the Seller had not violated any environmental laws. *Id.* at 1013.

In all three of the foregoing cases, the clause in which a corporation assumed environmental liability was broader than the clause in the Mobay–Allied Agreement.[13]

refuse to satisfy any such debt, liability, obligation or contract for reasonable cause but shall, subject to Paragraph 1.5 of this Agreement indemnify and hold Sellers harmless against payment or performance on the part of Sellers of any said debts, liabilities, obligations, or contracts including reasonable legal fees and expenses.
*Id.* at 1011.

**13.** In *Lyncott Corp.*, seller and buyer executed a Settlement Agreement to resolve disputes about claims involving the property. One section of the Settlement Agreement contained mutual covenants not to sue. *Lyncott Corp.*, 690 F.Supp. at 1413. The court found that this section, in which the parties agreed not to sue each other for "any claim, demand, action, cause of action or liability" that the parties have or may

In other cases involving assumption agreements, courts have required an express statement in the contract in order to transfer CERCLA liability. *Southland*, 696 F.Supp. at 1002; *Chemical Waste Management, Inc. v. Armstrong World Industries, Inc.*, 669 F.Supp. 1285, 1294 (E.D.Pa.1987). *See also Jersey City Redevelopment Auth. v. PPG Indus.*, 1987 WL 54410 (D.N.J.1987), *aff'd*, 28 Envtl.Rep.Cas. 1873, 866 F.2d 1411 (3d Cir.1988).[14] In *Southland*, a buyer purchased a facility on which hazardous waste was disposed in 1978. The buyer later sued the seller for reimbursement of cleanup costs under CERCLA. *Id.* at 997–998. The contract of sale provided:

> Seller shall protect, defend ... indemnify and save and hold harmless Buyer ... from and against any and all costs, expenses, damages, losses, obligations, lawsuits, claims, liabilities, fines, or penalties ... resulting from Seller's acts, alleged acts, omissions and alleged omissions before the Closing Date ... arising out of, resulting from or incident to:
>
> (4) the ownership, use, maintenance, or operation of the Assets or ... Business, and any action taken or omitted with or relating thereto, which occurred or arose during, or relates to, any period prior to the Closing.

*Id.* at 1002. This provision terminated two years after the closing of the sale. *Id.* at 1001–02.

The court determined that this limitations period barred only breach of contract claims based on indemnity and failure to remove hazardous waste. *Id.* at 1002. Elimination of these breach of contract claims did not "convert the remaining contractual language into an express assumption of liability for all hazardous waste cleanup costs by Southland." *Id.* Plain-

tiff's statutory contribution rights under CERCLA were preserved because there was no "clear transfer or release of future 'CERCLA-like' liabilities." *Id.* The court noted that, of course, a party could not "be expected to have presciently referred to CERCLA in an Agreement which was executed" years prior to the statute's enactment. *Id.* However, some clear transfer or release of future "CERCLA-like" liabilities is required. *Id.* "While a contract can, under appropriate circumstances, act to preclude recovery of response costs, there must be an express provision which allocates these risks to one of the parties." *Id.*, citing *Chemical Waste Management*, 669 F.Supp. at 1294.

In *Chemical Waste Management*, a purchaser of landfill sought response costs under CERCLA from the seller. In 1980, the buyer entered into an asset purchase agreement with the seller through which the plaintiff acquired all assets and rights in the landfill business. *Id.* at 1287–88.

The seller argued that the purchaser had impliedly warranted the safe disposal of defendants' waste. *Id.* at 1293–94. The court rejected this position, and found that the contractor did not impliedly warrant that it would not seek to recover response costs under CERCLA. *Id.* The court stated that, consistent with CERCLA's statutory scheme, in the absence of an express contractual provision to the contrary, an owner may seek contribution for response costs from customers who hired it to dispose of the waste. *Id.* at 1294. "If owners/operators and generators wish to redistribute the risks distributed by Congress, they must do so clearly and unequivocally." *Id.* at 1294–95.

 This Court finds it appropriate, in light of the legislative history and policy goals of CERCLA, to require that in order

---

have in the future, released the property owner from its CERCLA liability. *Id.* at 1418. This case is not directly relevant to the matter before the Court because it involved an agreement to specifically settle litigation disputes and included an extremely broad covenant not to sue.

**14.** In *PPG Industries,* the district court found that a clause stating that a purchaser would

indemnify the seller for all claims asserted by the purchaser, its agents or assigns "for bodily injury, ... and/or property damage arising out of relating to the liquidation and/or the purchase of the property." The court held that the provision did not waive the purchaser's right to sue the seller under CERCLA because it only dealt with claims relating to the liquidation and purchase of the property.

to preclude recovery of response costs, there must be a clear provision which allocates these risks to one of the parties. The Court cannot expect parties executing a contract prior to CERCLA to have foreseen the statute. However, in order for the Court to interpret a contract as transferring CERCLA liability, the agreement must at least mention that one party is assuming environmental-type liabilities.[15]

■ No such provision is contained in the Assumption Agreement. The Court finds that the property damage clause in Section 2(b)(ii) of the Assumption Agreement cannot be construed as a clear transfer of CERCLA liability. Mobay's predecessor only assumed liabilities for personal injury and property damage to third parties in Section 2(b). The language employed in this section of the Assumption Agreement is stereotypical of the type of language used to indemnify a transferor against a tort, nuisance or trespass claim. Environmental liabilities are nowhere mentioned in the Agreement. Thus, Mobay is not contractually prohibited from seeking contribution for response costs from Allied and the Court will grant Mobay's partial summary judgment motion.

### III. CONCLUSION

For the foregoing reasons, the Court will deny AHP's motion for summary judgment and grant Mobay and Allied a period of 45 days to amend their pleadings to state appropriate veil piercing claims against AHP. It will grant Mobay's motion for partial summary judgment and strike Allied's fifth affirmative defense. It will deny Allied's motion to compel discovery.

**15.** Although a contract containing a broadly-worded clause, waiving all liabilities of *any* type whatsoever, is not involved in this case, the Court would expect that such a contract would also constitute a waiver of CERCLA liability.