UNITED STATES of America, Plaintiff,

v.

Ben HARDY, et al., Defendants.

Civil A. No. 90–695–L(J).

United States District Court,
W.D. Kentucky,
Louisville Division.

Feb. 21, 1996.

Anna C. Thode, James R. MacAyeal, Environmental Enforcement Section, U.S. Department of Justice, Washington, D.C., Richard A. Dennis, Regina S. Edwards, Asst. U.S. Attys., United States Attorney, Louisville, KY, for U.S.

Mark Feather, David Langdon, Brown Todd & Heyburn, Louisville, KY, for Ben Hardy, The Hofgesang Foundation, Inc., J.H. Realty, Inc., Liquid Transporters, Inc. and Valley Sanitation, Inc.

Lloyd R. Cress, Carolyn M. Brown, Danny C. Reeves, Marcus P. McGraw, Greenebaum Doll & McDonald, Lexington, KY, for American Synthetic Rubber Co., Atlantic Richfield Co. (ARCO) and Industrial Disposal Co.

Jane I. Tudor, Greenebaum Doll & McDonald, Louisville, KY, for Ashland Chemical Co.

Thomas F. Harrison, Day Berry & Howard, Hartford, CT, for B.F. Goodrich Co. and The Olympic Homecare Products Co.

Bryan G. Tabler, Joan M. Heinz, Marcie R. Horowitz, Barnes & Thornburg, Indianapolis, IN, for Boone Box Co.

George L. Seay, Jr., Wyatt Tarrant & Combs, Frankfort, KY, for Courier Journal & Louisville Times, Reynolds Metals Co., Southern Gravure Service, Inc. and United Catalysts, Inc.

Victor Baltzell, Miller Mosley Clare & Townes, Louisville, KY, for George W. Whitesides Co.

Donald L. Cox, Scott R. Cox, Lynch, Cox, Gilman & Mahan, Louisville, KY, for Hoechst Celanese Corp. and Kewanee Industries, Inc.

Wayne J. Carroll, McKenzie & Peden, Louisville, KY, for Kurfees Coatings, Inc.

Louis H. Clark, Liberty Plastics & Metals Co., Louisville, KY, for Liberty Plastics & Metals Co.

Thomas T. Terp, Charles H. Pangburn, Taft, Stettinius & Hollister, Cincinnati, Ohio, Robert B. Craig, Taft, Stettinius & Hollister, Covington, KY, for Mobil Oil Corp.

Louis E. Tosi, Douglas G. Haynam, Peter J. McCabe, Suller & Henry, Toledo, Ohio, for Owens–Illinois, Inc.

Ellen S. Friedell, Senior Counsel, Rohm & Haas Co., Philadelphia, PA, for Rohm and Haas Co.

David S. Waskey, Day Smith Walton & Durham, Louisville, KY, for Standard Gravure Corp.

Richard M. Sullivan, Kenneth A. Bohnert, Edward F. Busch, Conliffe Sandmann & Sullivan, Louisville, KY, Brett D. Heinrich, Waste Management of Kentucky, Inc., Oak Brook, Illinois, for Waste Management of Kentucky, Inc.

John R. Cromer, Kenneth W. Maher, David E. Dearing, Cromer, Eaglesfield & Maher, Indianapolis, IN, for Dow Corning Corporation.

Edgar A. Zingman, H. Carl Horneman, Wyatt Tarrant & Combs, Louisville, KY, Vanessa M. Berge, David A. Smart, Wyatt Tarrant & Combs, Lexington, KY, for Ford Motor Company.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHNSTONE, Senior District Judge.

### FINDINGS OF FACT

This is a dispute regarding an indemnity claim arising from the disposal of waste at the Lee's Lane Landfill in Elizabethtown, Kentucky. It began when the United States of America brought suit against numerous defendants, alleging that they violated sec-

tion 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(a). The United States sought reimbursement of costs incurred in response to the release or threatened release of hazardous substances from the Lee's Lane Landfill. Most of the claims between the United States and defendants were settled when the court approved a consent decree between the parties on August 4, 1993. Dow Corning agreed to pay the United States $321,000 to resolve its alleged liabilities.[1]

This Consent Decree did not resolve a cross-claim of Dow Corning against Waste Management of Kentucky, Inc. Dow Corning contends that Waste Management, Tri-City Industrial Services' corporate successor, is contractually obligated to indemnify Dow Corning from all losses arising from the waste hauled out of the Elizabethtown plant.[2] The claim for these damages include: $321,-000.00 which it paid to the United States to settle its CERCLA claim; $354,902.53 in attorney's fees and costs allegedly incurred in defending itself against the United States and Waste Management's cross-claim; and prejudgment interest on the above sums. Waste Management argues that it has no obligation to indemnify Dow Corning and is not responsible for Dow Corning's cost associated with the Lee's Lane site. Waste Management further maintains that even if an indemnity agreement existed, it only covered a short period of time and did not encompass CERCLA liability.

The contractual relationship between Dow Corning and Tri-City originated over thirty years ago. Since then, time has taken documents, purchase orders, and witnesses. To determine the contractual relationship between the parties, the court must piece together documents, purchase orders, and testimony from witnesses, some of whom are deceased. In late 1963, Headie Lee, Purchasing Agent and Traffic Manager of Dow Corning, met with Palmer Benson, Operations Manager of Tri-City, now deceased, to discuss disposal of Dow Corning's waste.[3] Lee informed Benson that Dow Corning generated various kinds of waste, both liquid and solid.[4] During the course of negotiations, Benson toured the Dow Corning plant in Elizabethtown and Lee viewed Tri-City's disposal operation at the Lee's Lane Landfill in Jefferson County.[5] The Lee's Lane site was the only site that they visited.

During these discussions, Headie Lee was concerned with the proper disposal of all waste. At trial, Lee testified that he was concerned with whether "the waste materials would be disposed of in an acceptable manner" and whether Tri-City would "supply us [Dow Corning] with an indemnity agreement and certificates of insurance." (Trial Transcript p. 21.) In a 1969 deposition, Lee testified that Dow Corning was "primarily interested in the proper disposal of all waste" and was concerned about livestock becoming ill or being injured due to improper waste disposal. (Plaintiff's trial exhibit # 9, Headie Lee 1969 deposition, pp. 35–36.) Palmer Benson's statements were consistent with Lee's testimony. Benson, in a 1971 deposition, stated that Dow Corning was very con-

---

1. On February 8, 1991, Waste Management filed a cross-claim against Dow Corning claiming that it was entitled "to recover from Dow Corning, pursuant to CERCLA Section 113(f)(3)(B) and principles of common law contribution and indemnity, any amount Waste Management may be required to pay as a result of judgment or settlement in the above styled action." In defense, Dow Corning maintained that the express indemnification contract with Tri-City barred Waste Management's cross-claim. On August 4, 1993, Waste Management entered into a consent decree and agreed to pay the United States $128,-400.

2. For the purpose of this trial, Waste Management admitted that it is the corporate successor of Tri-City and that it has assumed any obligations that Tri-City had to Dow Corning.

3. Construction for Dow Corning's Sealants Plant in Elizabethtown, Kentucky began in the summer of 1963. On August 19, 1963, Dow Corning

hired Headie O. Lee as Purchasing Agent and Traffic Manager for its Elizabethtown plant. Lee's responsibilities involved obtaining all materials and services needed for operation of the Dow Corning's plant in Elizabethtown, including contracting for disposal of the plant's waste. Lee worked at the Elizabethtown plant until May 1967. In June 1967, Headie Lee became Packaging Coordinator for Dow Corning's corporate office and moved to Midland, Michigan.

4. Specifically, the Dow Corning plant generated loose production waste, bulk processing waste, cardboard, fiber drums, wood skids, waste solvents, and various finished materials that were not approved for distribution.

5. The Lee's Lane Landfill was a large, open, gravel pit that had a clay lining. It is a 112 acre tract of land and was used as a waste disposal site from the late 1940s until 1974.

cerned about "someone being hurt or damaged because of the type of material that they had." (Plaintiff's trial exhibit # 10, Palmer Benson 1971 deposition, pp. 5–6.)

On December 20, 1963, Benson and Lee toured the Tri–City manufacturing facilities, where the Anchorpac system was manufactured.[6] They also visited the Lee's Lane site. That same day, Benson wrote and signed a letter to Lee memorializing the discussions between the two. Dow Corning introduced the letter as plaintiff's exhibit # 1. The letter states:

> This will conform our conversation today concerning the ANCHORPAC SYSTEM and the disposal of your liquid by-product.
>
> We can install the P–1–28 ANCHOR-PAC unit at your dock five working days after receipt of your order for a 90 day trial period. The equipment will consist of the ANCHORPAC unit, the standard hopper, dock ramp and the 44 yard closed container. The total purchase price for this equipment is $10,250.00. The monthly lease price will be $332.00. At the end of the 90 day trial period, if the equipment is acceptable and the equipment is purchased, the $996.00 paid during the trial period would apply to the purchase price. If the equipment is leased the trail [sic] period would be applied to a 36 month lease. At the end of 36 months the equipment can be purchased for $512.50.
>
> *In disposing of the material from the ANCHORPAC, we would use the dump that you inspected today.*[7] This dump buries each load as it is dumped so that any product that is not destroyed in the ANCHORPAC would be destroyed and buried. If for some reason this does not prove satisfactory, we can dispose of the load at another dump where the material would be burned.
>
> Due to the characteristics of the material, the container may have to be sprayed with oil or some coating so the load will dump clean. After a load or two, we will

be able to determine what is required. We would haul these loads at $75.00 per load. The service would be on a call basis until we could set up a regular schedule and we would bring an empty container each time.

> In checking with George Whiteside Company, I found that they reclaim lacquers and lacquer thinners. We are hauling these residues which vary in consistency. I believe this material would be comparable to your liquids. To date we have had no problem with this material.
>
> We can supply a closed water tight 8 to 10 cubic yard container for your liquid. We can move this container a minimum of once a month at $75.00 per load. We would supply and maintain this container. *This material would also be dumped at the dump you visited today.* This is the same dump that we are disposing of the Whiteside material. It will be dumped in the same hole and will be covered. *Until you decide on this service, we would arrange to dispose of the barrelled material.*
>
> With regard to your liability concerning *either product · destruction or the liquid material,* we assume complete responsibility when the container is loaded into our truck. *In other words, we would hold you free and harmless from any liability resulting from any damage due to our hauling or disposing of these items.* We carry 100,000, 300,000 and 50,000 public liability insurance and we will supply a certificate of insurance.
>
> Thank you for this opportunity to quote.

(Plaintiff's trial exhibit # 1.) (Emphasis added.)

Lee testified at trial that he chose not to accept "the liquid-type container for the disposal of waste chemicals, liquids and semi-liquids," and chose not to "have our material burned at a dump." Other than that, Lee testified that Dow Corning "accepted" the entire letter, which included using the Lee's Lane site for disposal of waste and the indemnity agreement. (Trial transcript p. 24.)

---

**6.** As described in Waste Management of Kentucky's cross-motion for summary judgment filed on May 9, 1993, an "Anchorpac machine was a device which included a 44 cubic yard container designed for the disposal of solid waste. Waste would be loaded into the unit and compacted. The container would then be removed and replaced with an empty one, and then transported so that it could be emptied and readied for re-

use. Metal drums and liquid waste could not be used in the Anchorpac unit." (Waste Management of Kentucky's cross-motion for summary judgment, p. 6 n. 1.)

**7.** This dump was identified as the Lee's Lane Landfill by Headie Lee at trial and by Palmer Benson in a deposition.

On January 2, 1964, Dow Corning issued Purchase Order 150–N to Tri–City. The parties were unable to locate a copy of this purchase order form. However, evidence introduced at trial demonstrated that this purchase order was a two page document, with language on the front and back of each page. Headie Lee, on behalf of Dow Corning, and Palmer Benson, on behalf of Tri–City, signed both pages of the purchase order. The purchase order requested Tri–City haul and dispose of solid wastes in the Anchorpac for a three month trial period. After the trial period, Dow Corning could renew the terms of the contract for an additional three month period. The purchase order also requested that Tri–City dispose of barrelled/drummed waste for an indefinite period of time. Purchase Order 150–N consisted of an original copy and an acknowledgment copy which Tri–City was required to sign and return to Dow Corning as an acceptance.

Tri–City exclusively began to haul and dispose of wastes generated from Dow Corning's Elizabethtown plant on January 23, 1964. The waste was disposed at the Lee's Lane site. The liquid waste was placed in barrels or drums. The plant waste, other than barrelled waste, was placed into the Anchorpac container. Before January 23, 1964, there was "no manufacturing waste disposed of at the plant." [8]

On January 27, 1964, Palmer Benson, on behalf of Tri–City, executed a document entitled "Indemnity." Dow Corning introduced the document as plaintiff's exhibit # 2. The document states:

> In consideration of compensation paid by Dow Corning Corporation, its successor and assigns (hereinafter collectively referred to as "Dow Corning") to the undersigned for those certain waste disposal services described below, the undersigned hereby releases, discharges, and agrees to indemnify and save Dow Corning free and harmless from and against *any and all loss, damage, injury, liability, and any claim or claims therefor,* including claims for injury or death to *any and all persons or property* including but not limited to employees and property of the undersigned, howsoever caused, *resulting directly or indirectly* by the collection, transportation, and disposal by the undersigned, its employees, agents, or independent contractors, of certain flammable or otherwise hazardous waste chemicals or material from Dow Corning's premises and plant at Elizabethtown, Kentucky.

(Plaintiff's trial exhibit # 2.) (Emphasis added.)

In April 1964, the first three month trial period for use of the Anchorpac system expired. Although there are no documents, Dow Corning contends that the trial period was extended for another three months. On July 1, 1964, the second three month trial period for use of the Anchorpac system was over. Dow Corning issued Purchase Order No. 1125, entering into another agreement with Tri–City.[9] Benson signed this purchase order on behalf of Tri–City. The purchase order provided:

> Anchorpac Stationary Compactor Model P–L–23 complete with standard hopper, Dock ramp, and 44 yard close D container on a 36 month lease basis. Price as follows:
>
> | | |
> |---|---|
> | Anchorpac Unit | 196.00/mo. |
> | Standard Hopper | 10.50/mo. |
> | Dock ramp | 10.50/mo. |
> | 44 cu. yd. closed container | 115.00/mo. |
>
> At the end of the 36 month lease period, Dow Corning Corp. can purchase the above equipment for $512.50.
>
> Provide disposal of waste material in 44 cu. yd. container bringing empty container each trip. 75.00/load

---

8. The Elizabethtown plant began operations in late 1963. At first, the plant was used as a distribution center to distribute and package materials that had been manufactured in Midland, Michigan. Waste generated from these operations were stored at the plant. Dow Corning's Elizabethtown plant then began manufacturing various sealants, caulks, and adhesives in February or March of 1964.

9. Purchase Order 1125 pertained only to Anchorpac waste—not liquid waste. During the trial, Waste Management objected to the admissibility of purchase order 1125 and the court reserved ruling as to its admissibility. (Trial transcript pp. 32–33.) The court now holds that the document is admissible as secondary evidence to reconstruct the contractual relationship of Dow Corning and Waste Management and establish the terms of the original contract.

Tri–City Industrial Serv. Inc., assumes complete responsibility when the container [10] is loaded into your truck. Dow Corning Corp. will be held free and harmless from any liability resulting from any damage due to your handing or disposing of __. [11]

(Plaintiff's trial exhibit # 3.) There was no time frame specified for the service of providing waste disposal, only for the purchase/lease of the Anchorpac system equipment. The evidence indicates that Tri–City continued to dispose of Dow Corning's waste at the Lee's Lane site until April 1968.

In October 1990, the United States of America informed Dow Corning and Waste Management, along with many others, that they had been identified as potentially responsible parties (PRPs) at the Lee's Lane site under section 107(a) of CERCLA. The United States demanded approximately $3,400,000 from the PRPs. Shortly thereafter, Dow Corning advised Waste Management of the CERCLA claim against it. Dow Corning informed Waste Management that an express indemnity agreement existed between the parties and that Waste Management was responsible for the response costs connected with the site. (Plaintiff's trial exhibit # 19.)

The court conducted a bench trial on May 3 and 4, 1994 to resolve these issues. For the reasons that follow, the court concludes that an indemnity agreement existed between the parties. Dow Corning and Tri–City intended for the indemnity agreement to cover both drummed and Anchorpac waste. The agreement was in effect during the entire period that Tri–City hauled and disposed of Dow Corning's waste at the Lee's Lane site, from January 1964 until April 1968.

### CONCLUSIONS OF LAW

1. The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607, allows parties to allocate the costs of environmental clean up amongst themselves. Section 107(e)(1) of CERCLA, 42 U.S.C. § 9607(e)(1), provides:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

There appears to be an inconsistency in these two sentences. However, the Sixth Circuit, in *AM International v. International Forging Equipment*, construed § 107(e)(1) of CERCLA as follows:

[T]he first sentence provides that all parties involved are to be jointly and severally liable to the claimant under the statute. Where the claimant is the government, liability may not be transferred. However, as between the parties allegedly responsible ... liability may indeed be transferred. In other words, the first sentence ensures the clean up is performed and those responsible cannot escape their liability for cleaning the property. However, in terms of *financial* liability, the parties may allocate the costs of the clean up between them.

*AM International v. International Forging Equipment*, 982 F.2d 989, 994 (6th Cir.1993) (quoting *Niecko v. Emro Marketing Co.*, 973 F.2d 1296, 1300–01 (6th Cir.1992)) (emphasis in the original). *See Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1460 (9th Cir. 1986).

■ 2. For purposes of the present litigation, Waste Management, as the corporate successor of Tri–City, has assumed Tri–City's obligations to indemnity Dow Corning. Kentucky contract law governs the interpretation and construction of the contractual relationship between Dow Corning and Waste Management. *Anspec Co. v. Johnson Controls Inc.*, 922 F.2d 1240, 1251 (6th Cir. 1991); *AM International*, 982 F.2d at 995 n. 6. Under Kentucky law, Dow Corning has

---

**10.** Lee testified at trial that the container referred to is "only the Anchorpac," and that this indemnification clause only referred to the Anchorpac waste and not the drum waste. (Trial transcript p. 65.)

**11.** The last two words of this indemnity clause are illegible. It appears that the words are "our materials" or "any chemicals." Lee testified during the trial that he believed that the words are "our materials." (Trial transcript pp. 46, 64.)

the burden of proving the existence of all material terms of the express contract of indemnity. *Hickey v. Glass,* 285 Ky. 848, 149 S.W.2d 535, 536 (Ky.1941).

3. It is a basic premise of Kentucky contract law that a contract must "be construed according to the intentions of the parties." *State Farm Mut. Auto. Ins. Co. v. Hobbs,* 268 S.W.2d 420, 422 (Ky.1954). In interpreting a contract, "courts will look to the intention of the parties and will consider the subject matter of the contract, the objects to be accomplished, the situation of the parties and the conditions and circumstances surrounding them." *McHargue v. Conrad,* 312 Ky. 434, 437, 227 S.W.2d 977, 979 (Ky. 1950) (citing *Meacham v. Louisville & N.R. Co.,* 293 Ky. 642, 169 S.W.2d 830 (Ky.1943)). *See Reese v. Greenlee,* 308 Ky. 275, 278, 214 S.W.2d 262, 264 (Ky.1948); *Louisville & N.R. Co. v. David J. Joseph Co.,* 298 Ky. 711, 714, 183 S.W.2d 953, 955 (Ky.1944). Courts must "look to the acts of the parties in the execution and fulfillment of the agreement." *Jones v. Linkes,* 267 S.W.2d 936, 937 (Ky. 1954); *Taylor v. Rosenthal,* 308 Ky. 4, 6–7, 213 S.W.2d 435, 437 (Ky.1948). Contracts "must be construed as a whole, giving effect to all parts and every word in it if possible." *City of Louisa v. Newland,* 705 S.W.2d 916, 919 (Ky.1986).

4. In *Veech v. Deposit Bank of Shelbyville,* the Court of Appeals of Kentucky, then the state's highest court, wrote: "Different instruments relating to and constituting a part of the same transaction may be interpreted together in determining the intention of the parties." *Veech v. Deposit Bank of Shelbyville,* 278 Ky. 542, 128 S.W.2d 907, 913 (Ky.1939). *See also Dohrman v. Sullivan,* 310 Ky. 463, 220 S.W.2d 973 (Ky.1949). The reasoning of the *Veech* decision is echoed in the Restatement (Second) Contracts and various case law. The Restatement (Second) of Contracts § 202(2) (1981) teaches: "A writing is interpreted as a whole, and all writings that are part of the *same transaction* are interpreted together." (Emphasis added.) The court finds this to be the majority view. *See Friendly Consumer Discount Co. v. Foell,* 121 A.2d 434, 436–37 (N.J.Super.Ct.App.Div.1956); *Schubert v. Ivey,* 158 Conn. 583, 264 A.2d 562, 564 (1969); *Costello v. Watson,* 111 Idaho 68, 72, 720 P.2d 1033, 1037 (1986); and *Baker v. Wilburn,* 456 N.W.2d 304, 306 (S.D.1990).

5. In the present situation, it was the parties' intentions to incorporate an express indemnity agreement into the contract. During the negotiations, Headie Lee emphasized that he wanted the waste to be disposed of in an "acceptable manner" and he required that Tri–City provide him with an "indemnity agreement and certificates of insurance." The letter of December 20, 1963 explicitly stated: "we would hold you free and harmless from any liability resulting from any damage due to our hauling or disposing of these items." This language was mirrored in the document entitled "Indemnity" and yet again in Purchase Order 1125. After examining the entire transaction, it is apparent that the parties intended to include an express indemnity agreement in the contract as a whole.

6. Although the court examined the series of writings to determine that the parties intended to incorporate an express indemnity agreement into the contract as a whole, the court will outline the documents which encompassed the entire transaction. The first document that the court considered was the December 20, 1963 letter from Palmer Benson to Heady Lee. Dow Corning maintains that this letter is an offer or proposal to enter into a contract; Waste Management contends that this letter represents a price quotation or an invitation to make an offer. Restatement (Second) of Contracts § 24 (1981) defines an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." In other words, an offer "must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain." *Klein v. Citizens Union National Bank,* 281 Ky. 650, 136 S.W.2d 770, 773 (Ky.1940) (citing Restatement (First) of Contracts § 32); *Fowler's Bootery v. Selby Shoe Co.,* 273 Ky. 670, 117 S.W.2d 931, 933 (Ky. 1938).

7. Here, Benson, in a deposition, stated that before preparing the letter, he had already visited the Dow Corning plant and

discussed an arrangement for "the disposal of their waste material." (Plaintiff's trial exhibit # 10, Palmer Benson 1971 deposition, p. 4.) Benson stated that after he had toured the Lee's Lane site, he "submitted a proposal" to Headie Lee. (*Id.*) This "proposal" was addressed to a specific person and contained "definite" prices, time frames, potential services, and an indemnity clause. These facts "justify" Lee in "understanding that his assent" to the letter was invited and would form a contract.

■ 8. The next piece of evidence in the contractual sequence was Purchase Order 150–N.[12] Dow Corning maintains that the purchase order was an acceptance of the offer; Waste Management argues that it was an offer itself or a counteroffer. From the evidence, the court believes that Purchase Order 150–N was an acceptance. Restatement (Second) of Contracts § 50 (1981) defines an acceptance as "a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." In *Venters v. Stewart*, the Court of Appeals of Kentucky, then the state's highest court, explained that "an acceptance must comply exactly with the requirements of the offer, omitting nothing from the promise or performance requested." *Venters v. Stewart*, 261 S.W.2d 444, 446 (Ky.1953). *See Casner v. Oldham*, 279 S.W.2d 252, 255 (Ky. 1955).

■ 9. Here, when Lee signed Purchase Order 150–N, he entered into a contract with Tri–City that contained the following terms: (1) disposal of solid waste using the Anchorpac system for a three month trial period; (2) disposal of liquid wastes in drums or barrels for an indefinite period of time; and (3) an express indemnification agreement that would "hold [Dow Corning] free and harmless from any liability resulting from any damage due to our [Tri–City's] hauling or disposing of these items." Under Kentucky law, a contract which "contains no time for performance—*especially if it is one contracting for service* to be performed—is an indefinite contract as to performance and may be terminated by either party at will, and whether or not it was so intended by the parties is to be gathered from all parts of the contract and the circumstances under which it was executed, as well as the purpose to be accomplished." *Duff v. P.T. Allen Lumber Co.*, 310 Ky. 439, 220 S.W.2d 981, 983 (Ky. 1949) (emphasis added). Since there was no duration stated for the hauling and disposal of liquid waste, it was an "indefinite contract as to performance" and was subject to termination by either party at will.[13] This contract, including the indemnity agreement, continued until April 1968.

■ 10. Tri–City argues that the contract cannot be upheld because the back pages of Purchase Order 150–N may have contained language that was inconsistent with the indemnity clause. Restatement (Second) of Contracts § 203(d) (1981) teaches:

In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:

(d) separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated.

The parties specifically negotiated for the indemnity agreement and intended that it be a part of the entire contract. The indemnity agreement is a "separately negotiated" term

12. At trial, Lee testified that an order that has an "N" on it "means that no receivers are prepared for the receiving department to acknowledge receipt of the materials on [it].... An "N" document would be like that [if something was going out] or even like the Anchorpac brought in and installed for evaluation, or if it was already on site or something." A non-"N" document meant that there they were "receiving material." (Trial transcript p. 41.)

13. Even if the court chose to interpret the December 20, 1963 letter as an invitation to make an offer, the result is the same. Purchase order 150–N would be construed as the offer and the return of the signed acknowledgment copy would be considered the acceptance. Kentucky contract law dictates that a contract "must be construed according to the intentions of the parties." *State Farm Mut. Auto. Ins. Co. v. Hobbs*, 268 S.W.2d 420, 422 (Ky.1954). Here, parole or extrinsic evidence is admissible, including the letter of December 20, 1963 and the January 27, 1964 "Indemnity" agreement to show that the parties intended to include an express indemnity agreement in the contract. *Hammon v. Kentucky Central Life & Accident Insurance Company*, 289 S.W.2d 726, 728–29 (Ky.1956); *Gibson v. Sellars*, 252 S.W.2d 911, 913–14 (Ky.1952).

and takes precedent over any standardized terms that may have conflicted with it. The evidence introduced at trial demonstrated that the language on the back of the agreement would not have addressed an indemnity obligation.[14]

■ 11. Next, the court examined the document entitled "Indemnity." This document was signed by Benson on behalf of Tri–City on January 27, 1964. Dow Corning argues the indemnity agreement was part of the entire contract, and indemnifies Dow Corning from any damages that arose from the disposal of its waste by Tri–City. In other words, Dow Corning contends that the document "memorialized the intended scope of Tri–City's duty to indemnify Dow Corning as was contained in the December 20, 1963 letter." Since there was no time limitation on the agreement, Dow Corning maintains that the parties intended it apply as long as Tri–City disposed of Dow Corning's waste. Conversely, Waste Management maintains that the document cannot be considered because it is a modification of the contract and is not supported by separate consideration. The court agrees with Dow Corning's position. Restatement (Second) of Contract § 216 (1981) states:

(1) Evidence of a consistent additional term is admissible to supplement an integrated agreement unless the court finds that the agreement was completely integrated.

(2) An agreement is not completely integrated if the writing omits a consistent additional agreed term which is

(a) agreed to for separate consideration, or

(b) such a term as in the circumstances might naturally be omitted from the writing.

Comment d to § 216 provides that "evidence of the consistent additional terms is admissible unless the court finds that the writing was intended as a complete and exclusive statement of the terms of the agreement." Restatement (Second) of Contract § 216 cmt. d (1981). In *Dohrman v. Sullivan,* 310 Ky. 463, 220 S.W.2d 973, 975 (Ky.1949), the court held that if "all the material terms which are to be incorporated into the contemplated future instrument have been agreed upon," it may be inferred that the instrument is "to be a mere memorial of the contract already final by the earlier mutual assent of the parties to those terms."

12. Here, the court finds that the letter of December 20, 1963 and Purchase Order 150–N did not form a completely integrated document.[15] Further, the indemnity agreement may "naturally [have] be[en] omitted from the writing." During the trial, Lee testified that after Benson signed Purchase Order 150–N, they had a contract, but they "were still awaiting the completion of the indemnity agreement." (Trial transcript p. 57.) Evidence of the "Indemnity" document is admissible as "a consistent additional term" and may be used to supplement the partially integrated contract. The language in the "Indemnity" document expressly indemnified Dow Corning from damages that arose from all of the waste and continued until the contractual relationship between Tri–City and Dow Corning ended.[16]

---

**14.** To demonstrate that the back did not address indemnity, Dow Corning offered trial exhibit # 35 into evidence. Plaintiff's trial exhibit # 35 is a December 14, 1966 purchase order prepared by the Midland, Michigan plant. The court allowed this document in for the purpose of refreshing Lee's memory as to the legal terms on the back of the document. According to Lee, Dow Corning used identical language on all of its purchase orders from all of its plants, and that the language on the document never changed. Lee testified that there was nothing on the back of the terms and conditions which addressed or affected indemnity. (Trial transcript pp. 48–53.)

**15.** Restatement (Second) of Contracts § 210 (1981) states:

(1) A completely integrated agreement is an integrated agreement adopted by the parties as a complete and exclusive statement of the terms of the agreement.

(2) A partially integrated agreement is an integrated agreement other than a completely integrated agreement.

(3) Whether an agreement is completely or partially integrated is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule.

**16.** Tri–City contends that the language of the "Indemnity" document, specifically *"certain flammable or otherwise hazardous waste chemicals or material"* necessarily refers to another document. The court does not agree. By looking at the intent of the parties and the evidence at trial, the "Indemnity" agreement covered all waste. There is no evidence that this phrase refers to another document. If the term "certain" refers to anything at all, the evidence shows that it encompasses the various types of wastes which were discussed by Benson and Lee during their negotiations.

13. In April 1964, the first three month trial period for use of the Anchorpac system expired. The trial period was extended for another three months. On July 1, 1964, the second three month trial period was over. Dow Corning issued Purchase Order No. 1125, which Benson signed on behalf of Tri–City, entering into another agreement with Tri–City. Dow Corning would lease an Anchorpac, a standard hopper, a dock ramp, and a forty-four cubic yard closed container from Tri–City for thirty-six months. At the end of the thirty-six month lease period, Dow Corning had the option of purchasing this equipment. Although there was a time frame for the lease/purchase of the Anchorpac system, there was no time frame for the service of hauling/disposing of the Anchorpac waste. Under *Duff v. P.T. Allen Lumber Co.*, 310 Ky. 439, 220 S.W.2d 981, 983 (Ky. 1949), the agreement for the service of hauling and disposing of Anchorpac waste was an "indefinite contract as to performance" and could have been "terminated by either party at will." This contract, including the indemnity agreement, continued until April 1968. Further, Purchase Order 1125 reaffirmed the indemnity agreement that existed between the parties.

■ 14. The right to recover under an indemnification agreement is well recognized in Kentucky. *National Surety Corp. v. Peoples Milling Co.*, 57 F.Supp. 281, 282 (W.D.Ky.1944); *Fosson v. Ashland Oil & Refining Co.*, 309 S.W.2d 176, 178 (Ky.1958); *United States Fidelity & Guaranty Co. v. Napier Electric and Constr. Co., Inc.*, 571 S.W.2d 644, 646 (Ky.Ct.App.1978). Waste Management argues that even though the parties had an indemnity agreement, they did not contemplate environmental damage, and thus the indemnity agreement between the parties was not broad enough to encompass CERCLA liability. The court does not agree. An intent to indemnify against CERCLA liability "may be found where the language of the indemnification is so broad and all-inclusive that it necessarily sweeps all events—including those occurring because of the indemnitee's actions—into its coverage." *United States v. Hardage*, 985 F.2d 1427, 1434–35 (10th Cir.1993). *See Fosson*, 309 S.W.2d at 178. How to determine whether an indemnity agreement contemplated CERCLA liability was discussed in *Purolator Products Corp. v. Allied–Signal, Inc.*, 772 F.Supp. 124, 130 (W.D.N.Y.1991). The *Purolator* Court held:

> [An] agreement which shows that the parties intended to resolve all their disputes involving any type of claim includes CERCLA claims, even if the agreement is framed in general terms and does not specifically refer to CERCLA or to environmental liability. *See, e.g., Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454 (9th Cir.1986); *Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 358 n. 15 (D.N.J. 1991); *Rodenbeck v. Marathon Petroleum Co.*, 742 F.Supp. 1448 (N.D.Ind.1990); *FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285 (D.Minn.1987). However, if the agreement appears to be limited to specific disputes or particular types of liability, CERCLA liability will be excluded unless the agreement contains a clear, unambiguous reference to such liability. *See, e.g., Mobay*, 761 F.Supp. at 357–58; *Southland Corp. v. Ashland Oil, Inc.*, 696 F.Supp. 994, 1002 (D.N.J.1988).

*Purolator Products Corp. v. Allied–Signal, Inc.*, 772 F.Supp. 124, 130 (W.D.N.Y.1991).

■ 15. Here, the language in the indemnity agreement was "broad and all-inclusive" and was "framed in general terms." The agreement was not limited to any specific type of loss or damage. Rather, the parties included broad terms such as "*any and all* loss, damage, injury;" "claims for injury or death *to any and all persons or property;*" "free and harmless from *any liability* resulting from *any damage;*" and "resulting *directly or indirectly* by the collection, transportation, and disposal by the undersigned." The intent to provide a broad indemnification agreement is also evidenced by the parties' discussions surrounding the execution of these documents. Headie Lee informed Palmer Benson that he was extremely concerned with the proper disposal of all waste, both liquid and solid. Lee also told Benson that he was concerned with the possibility of livestock becoming ill or being injured due to improper waste disposal. (Plaintiff's trial exhibit # 9, Headie Lee 1969 deposition, pp. 35–36.) Benson, in a 1971 deposition, testified that Dow Corning was concerned about "someone being hurt or damaged because of

the type of material that they had." (Plaintiff's trial exhibit # 10, Palmer Benson 1971 deposition, pp. 5–6.) Based on this language, the indemnification agreement in the present action covered CERCLA liability. Dow Corning is entitled to recover the amount of $321,000 from Waste Management.

16. Under *Chittum v. Abell*, 485 S.W.2d 231, 237 (Ky.1972), Waste Management had a duty to defend Dow Corning against the CERCLA claims. Pursuant to *Chittum* and *Nucor Corporation v. General Electric Company*, 812 S.W.2d 136, 147–48 (Ky.1991), Dow Corning may be entitled to recover attorneys fees from Waste Management. In *Nucor*, the Supreme Court of Kentucky wrote that the general rule in Kentucky "is that each party is responsible for its own fees and expenses." *Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136, 147 (Ky.1991). There is an exception to this general rule, as follows:

> "Where a person is obliged to defend against the act of another, against whom he has a remedy over, he may, if such other has notice of the suit and an opportunity to defend, hold him liable for the amount of damages recovered against himself and which he is compelled to pay, together with interest thereon, and also all *reasonable and necessary* costs and expenses incurred in such defense, including attorney's fees." *Middlesboro Home Tel. Co. v. Louisville and N.R. Co.*, 214 Ky. 822, 284 S.W. 104, 108 (Ky.1926).

*Id.* (quoting *Middlesboro Home Tel. Co. v. Louisville and N.R. Co.*, 214 Ky. 822, 284 S.W. 104, 108 (Ky.1926)) (emphasis added). The award of attorneys fees depends on equitable factors:

> "[T]he allowance of such fees is *not automatic in an indemnity judgment*, but rather *depends upon the equities of the situation*, and particularly upon whether the indemnitor failed to provide adequate defense of the claim for damages."

*Id.* (quoting *Chittum v. Abell*, 485 S.W.2d 231, 237 (Ky.1972)) (emphasis added).

17. Here, Dow Corning seeks to recover legal fees in the amount of $272,537.50 and costs in the amount of $82,365.03, a total amount of $354,902.53. During the trial, three witnesses testified about attorneys fees and costs: John R. Cromer, Mark S. Medlin, and Donald L. Cox. John Cromer, an attorney with Cromer, Eaglesfield & Maher, counsel for Dow Corning, testified that the entire amount of $354,902.53 was reasonable and necessary. He explained that Dow Corning was charged rates that were "competitive nationally." (Trial transcript p. 88.) The bill included $80,000 for a computer support system containing documents and information with respect to Dow Corning's litigation. He further testified that twenty percent of the total bill was redacted to reach the figure of $354,902.53. Mark S. Medlin, an expert witness for Dow Corning, testified that "$272,537.50 of the [legal] fees incurred by the Dow Corning Corporation would be reasonable in this matter." (Trial transcript p. 119.) He based his opinion on basically three elements: (1) the number of hours spent performing legal tasks; (2) the market rate per unit of time; and (3) a multiplier (of one) applied to the first two elements. (Trial transcript p. 120.) *See* Rule 1.5 of the Kentucky Rules of Professional Conduct. Finally, Donald L. Cox, an expert witness for Waste Management, testified as follows:

> The figures that I came up with on that issue was about $25,000.00 just in round numbers of, of the bills here, appeared to be clearly okay, and about $25,000.00 of the bills quite clearly were not okay, were things that didn't seem to have anything to do with the case. Then there was 157,000 that the work involved services that some of the work probably was compensateable and some wasn't, but there was no breakdown. And there was another $150,000 that I couldn't tell one way or the other. Basically there's, there's $25,000 of fees here that seem to be something they were entitled to and the rest is just a big question mark.

(Trial transcript p. 148.) In addition to these testimonies, Dow Corning introduced trial exhibits 26 through 26–A35. These exhibits document the legal fees and costs charged to Dow Corning by the law firm of Cromer, Eaglesfield & Maher. The court has reviewed these voluminous records. Based on the testimonies and records, the court concludes that seventy-eight percent of $354,902.53 are reasonable and necessary fees and costs, or $276,823.97.

18. However, "allowance of such fees is not automatic in an indemnity judgment, but rather depends upon the equities of the situation." *Nucor Corp.*, 812 S.W.2d at 147 (quoting *Chittum v. Abell*, 485 S.W.2d 231, 237 (Ky.1972)). In determining the amount of recoverable attorneys fees, the court recognizes that both parties are equally responsible for misplacing significant documents pertaining to this case. The loss of these documents created much confusion over the terms of the contract and the respective obligations of the parties. Thus, in the interest of equity, the reasonable and necessary fees and costs of the litigation should be borne equally by both parties. The court concludes that Dow Corning may recover legal fees and costs in the amount of $138,411.99.

19. Finally, the court must decide whether to award prejudgment interest. Under Kentucky law, "if the claim is liquidated, interest follows as a matter of right, but if it is unliquidated, the allowance of interest is in the discretion of the trial court." *Hale v. Life Ins. Co. of North America*, 795 F.2d 22, 24 (6th Cir.1986) (citing *General Accident Fire & Life Assurance Corp. v. Judd*, 400 S.W.2d 685, 687 (Ky.1966)). In *Nucor Corporation v. General Electric Company*, the Supreme Court of Kentucky stated that liquidated "means '[m]ade certain or fixed by agreement of parties or by operation of law.'" *Nucor Corp.*, 812 S.W.2d at 141 (Ky.1991) (quoting *Black's Law Dictionary* 930 (6th ed. 1990)). The *Nucor* Court listed several examples of liquidated claims, including "a bill or note past due, an amount due on an open account, or an unpaid or fixed contract price." *Id.* Unliquidated means "'[d]amages which have not been determined or calculated, ... not yet reduced to a certainty in respect to amount.'" *Id.* (quoting *Black's Law Dictionary* 1537 (6th ed. 1990)). The decision of whether to award interest on unliquidated damages "rest[s] with the trial court." *Nucor*, 812 S.W.2d at 143. On an unliquidated claim, interest "may be allowed as justice requires." *Id.* at 144 (quoting Restatement (Second) of Contracts § 354). Based on *Hale* and *Nucor*, Dow Corning shall recover prejudgment interest on the amount it paid to settle its CERCLA claim, i.e. $321,000, but shall not recover prejudgment interest on legal fees and costs.

20. In sum, the court concludes that an express indemnity agreement existed between Dow Corning and Tri–City. The indemnity agreement covered both liquid and solid waste and continued until April 1968. The agreement was broad and "framed in general terms," and thus encompassed CERCLA liability. Dow Corning is entitled to recover the following amounts from Waste Management:

(1) The amount that Dow Corning paid to the United States to resolve its CERCLA liability, $321,000;

(2) Costs and legal fees in the amount of $138,411.99; and

(3) Prejudgment interest on the amount of $321,000.

An appropriate judgment accompanies these findings of fact and conclusions of law.

### JUDGMENT

For the reasons stated in the Findings of Fact and Conclusions of Law, IT IS ORDERED that Dow Corning is entitled to recover the following amounts from Waste Management:

(1) $321,000, the amount that Dow Corning paid to the United States to resolve its CERCLA liability;

(2) $138,411.99 in costs and legal fees; and

(3) Prejudgment interest on the amount of $321,000.